Arnold E. JOHNSON, Appellant,

v.

The STATE of Texas

No. 72697.

Court of Criminal Appeals of Texas.

April 15, 1998.

Michael C. Gross, San Antonio, for appellant.

Roderick B. Glass, Asst. Dist. Atty., San Antonio, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MANSFIELD, Judge, delivered the opinion of the Court. McCORMICK, Presiding Judge, and OVERSTREET and PRICE, Judges, join.

A Bexar County jury found appellant, Arnold E. Johnson, guilty of the October 26, 1995, capital murder of Frank Johnson, Jr. See Tex. Penal Code § 19.03(a)(2).[1] At the punishment stage of trial, the jury answered the special issues in such a manner as to require the trial court to sentence appellant to death. See Tex.Code Crim. Proc. article 37.071, § 2(b), (e), & (g).[2] Direct appeal to this Court is automatic. *Id.* at § 2(h). Appellant brings 53 points of error in his brief to this Court. We will reverse the judgment of the trial court and remand the cause for a new trial.

We will address appellant's evidentiary sufficiency point first, and then we will ad-

dress points of error numbers one and twelve. Because of our resolution of these points, it is unnecessary for us to address the remainder of appellant's claims.

In point of error number 53, appellant argues that he has been denied his liberty without due process of law because the evidence adduced at trial was insufficient to support the jury's finding of guilt. Appellant argues that because Reginald Taylor, a surviving victim of the offense, was unable to identify him in court as the person who assisted Carl Brooks in the capital murder of Frank Johnson, Jr., there is no evidence linking him to this offense.

The jury charge instructed the jurors that, to find appellant guilty of capital murder, they had to find he committed the offense of murder by intentionally or knowingly causing the death of an individual while in the course of committing or attempting to commit the offense of robbery and/or kidnapping. The charge also included a paragraph on the law of parties. See Tex. Penal Code § 7.02(a)(2).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that every state criminal conviction be supported by evidence that a rational factfinder could find as sufficient to prove all the elements of the offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 362–364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *Coit v. State,* 808 S.W.2d 473, 475 (Tex.Crim.App.1991). Section 2.01 of the Penal Code contains the same requirement. As an appellate court reviewing a cold record long after the jury has evaluated the evidence and made its finding, our task is to consider all the record evidence, direct and circumstantial, in the light most favorable to the jury's verdict, and to determine whether, based on that evidence, any rational jury could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319–320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State,* 820 S.W.2d 154, 158–159 (Tex.

---

**1.** Texas Penal Code § 19.03(a)(2), provides in relevant part that "[a] person commits an offense if he commits murder as defined under Section 19.02(b)(1) and the person intentionally commits the murder in the course of committing or at-

tempting to commit kidnapping [or] robbery...."

**2.** All references hereinafter to articles are to those in the Texas Code of Criminal Procedure.

Crim.App.1991). In determining sufficiency of the evidence, we consider all the evidence, admissible and inadmissible. *Gardner v. State*, 699 S.W.2d 831, 835 (Tex.Crim.App. 1985). If, based on all the evidence, a reasonably-minded jury must necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal. Appellate judges are not factfinders, however; we may not reevaluate the weight and credibility of the record evidence. Rather, we act only "as a final, due process safeguard ensuring . . . the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988).

The State presented twenty-six witnesses and numerous exhibits at guilt/innocence in an effort to prove its case. The most incriminating evidence came from a statement made by the surviving victim, Reginald Taylor:

> My name is Reginald Taylor, I am 17 years old. My date of birth is 12–05–77. I live at 556 Pennystone with my Mother and brother Christian Taylor. I went to the Cass Job Corps in Arkansas and I got an Arkansas High School Diploma. I can read and write and understand English. I am not working right now but I'm putting in applications I used to work at Bill Millers.
>
> I have come to the Homicide Office at the San Antonio Police Department, to give Detective Hernandez a statement about how my friend Frank Johnson got killed. At 2:30 p.m. on October 26th 1995 I ran into Frank Johnson at the Candle Stick Apartments off of Rigsby. I know Frank Johnson as Frank Jr. I have known him for three weeks. He was in a white car I don't know what the make was, When I saw him he was going to his apartment, I waited downstairs, with a friend of mine named Demetrius DeLane I call him Mickery. When frank Jr. Came down he said I'm gonna go drop some "dank" off "dank" being pot, marijuana. Mickery said why don't you give us some and Mickery went up and got a joint. After that we all left and Frank Jr. said I Gotta go to Big Arnold's garage. All I knew is that it was by the Phillips 66 at MLK and 10. He asked if either one of us had a beef with big Arnold or little Arnold or any of them "Jolly Time niggers". Mickery said yea I got a beef with big Arnold and little Arnold. I said lets go, Mickery had a Glock 40. Frank parked near the Phillip 66 and frank went to Big Arnold's garage. He took the pound of weed in a towel. He wasn't coming back, about five minutes passed and Little Arnold Ross, His Daddy big Arnold owns the Garage. Little Arnold said that Frank Jr. Had told hm to bring the car round back. So we believed him and he parked the car in the back near the gates. Little Arnold said Frank told me to tell you to get out the car.
>
> Me and Mickery walked around and I saw this dude wearing an Emmit Smith Jersey it was a white Dallas Cowboys Jersey with the stars on it and the number 22 I think it said Smith on the back. He pulled a Tech–9 it was black and it had a silverish color clip, it had thing on the end of the barrel with holes in it. He said 'yall niggers get in hear," He pointed the gun at us, Mickery pulled his Glock but it wasn't cocked so he bailed, he ran around the corner and I didn't see him no more. The guy with the Tech made me go in and sit down in the office. Frank was in the office behind the desk, Little Arnold was next to me on the couch. Dometric Jones was outside near the window with another dude I don't know who he was. The Dude with the tech asked Dometrich if he had his "strap" on, meaning a gun, Dometrich said no, He asked the guy sitting next to Dometrich if he had his the guy said yea I got's mine. Little Arnold was asking frank if he had any more money, and Frank said I give you all I had, the dude with the Tech said "all you had was a pound of weed and twenty-five Dollars" They kept asking Frank for more weed and finally Frank said all I got is six ounces left, it's in the car. Some dude went and got the weed. They told me to get off the couch and go stand by Frank. Little Arnold and the dude with the Tech–9 told me to strip, they told me to take off my shoes and my clothes. Little Arnold drove the car from the back to the front and backed it into the

garage near the office where we were. Domitrich opened the Door and the guy with the Tech–9 pointed the gun at us and said get in the car. I got in the back seat first and FRANK got in the front passenger seat. Little Arnold had been sitting in the drivers seat since he had backed the car in. The guy with the Tech got in the back passenger seat right behind Frank. The guy with the Tech–9 pointed the gun at me and told me to bend down. He said "nigger don't look up keep your head down or I'll kill you. I don't know where we were going, we didn't drive more than ten minutes. Little Arnold he told me to get out, the dude with the Tech–9 said no. We drove a little bit more and When we first got into that neighborhood Little Arnold said I'm gonna take you to where I dumped the Last Nigger I killed. I remember we made a right turn. I heard a shot, I saw blood come off Franks neck the guy with the Tech–9 shot frank. Little Arnold said Shoot him in the head, and at the same time he say get out the car. so I bailed, I saw him raise the Tech–9 as I jumped out. the car never stopped rolling. I'm running down the street, I didn't know where I was I trying to get help. I never looked back. I ran towards where I saw some people standing, I told them to call the Police they told me to get out of here, I saw the Whataburger, I saw the access rd and I ran all the way to Southcross, and I ran all the way home to Pennystone. I told my little brother what happened, My brother Christian and me caught the 3:35 bus to Starcrest and I told Larry what happened I don't know Larry's last name. I told him we need to tell his mother. Larry called them, Me Larry's Girlfriend, Larry and my brother got in her car and we drove back to where the shooting happened. I saw all the blood, some people told us they had found a body and the Police had already left. After that we went to Frank's mother's house and waited for the Detectives to call so I could give my statement. I did not hear from the Detective so Larry's girlfriend and Larry drove me to the East Side Sub Station. The Police brought me downtown where I spoke with you.

All I have told you is the truth, I really don't know little Arnold but can identify him if I see a picture of him, I have known Dometrich Jones three years, and I don't know the guy with the Tech–9 but if I see a picture of him I can recognize him. I remember seeing a Tatoo on little arnold that said "Pookie"

I have read this statement and it is the truth.

(All errors included are as they appear in the statement.)

During Taylor's cross-examination, Defense counsel had appellant strip down to his waist to demonstrate the absence of a tatoo which read "Pookie." Appellant did, however, have a tatoo on his right arm which read "Lil Arnold."

Harold Bellamy, a San Antonio police officer, testified that he showed Taylor two photo arrays of suspects in this case. The first one was shown on October 27, 1995, but Taylor was unable to identify appellant. The second photo array, which included a more recent photograph, was shown on October 28, 1995, and Taylor positively identified appellant.

Zachary Greenwood testified that he was present at Jesko's Automotive Shop in San Antonio on October 26, 1995, and that he saw both appellant and Carl Brooks at the shop. He also observed Frank Johnson walking toward Jesko's. A short time later appellant drove a white, four-door car in which two other men were passengers. Appellant parked the car in a garage around the back of Jesko's. A man who appeared to have something in his hand, frantically ran away from Jesko's. Shortly thereafter, appellant, Brooks, Johnson and an unidentified man drove away in the white, four-door car previously mentioned. Approximately forty-five minutes later, a car with a woman driver pulled up at Jesko's; subsequently, appellant and Brooks emerged from the vehicle.

Evelyn Marie Whitley testified that she saw appellant at approximately 2:50 p.m. on the afternoon in question while she was putting some clothes in her car. Brooks or appellant asked her if she would give them a

ride to Kenmar Street. Whitley declined, but did agree to take them to Jesko's.

Manuel Keith, a San Antonio police officer, testified that at 3:15 p.m., October 26, 1995, he received a dispatch requesting that he go to the intersection of Twohig and G Streets to investigate a "down and out".[3] Upon arrival, he discovered Johnson's body lying face down with blood oozing from the back of his head.

Dr. Carolyn Rivercomb, an assistant medical examiner for Bexar County, testified that on or about October 27, 1995, she performed an autopsy on Johnson. He had been shot twice. One gunshot wound was to the back of the neck. The second gunshot wound, which was fatal, entered the back of Johnson's head slightly left of the midline. Both wounds went completely through the body and both were surrounded with soot and powder grains indicative of the gun being fired within one foot of the victim.

Richard Funk, a San Antonio police officer, testified that on October 29, 1995, he received a dispatch requesting that he go to 369 Kenmar and search a particular drainage ditch culvert for clothing. After removing a manhole cover, Funk discovered a tennis shoe and a pair of blue pants inside the drainage ditch.

Lonnie Ginsberg, of the Bexar County Forensic Science Center, testified the pants and tennis shoes found in the drainage ditch tested positive for blood. Deoxyribonucleic Acid (DNA) found on the clothes was consistent with Frank Johnson's DNA.

Brian Custard, a San Antonio police officer, testified that on October 26, 1995, he investigated a 1985 Oldsmobile Regency '98 which was found at Hedges and Terrell Streets and believed it to be involved in a homicide. Among the items discovered were a spent shell casing outside the driver's door, blood stains on the sidewalk and curb, blood and brain matter on the door of the car, a live 9 millimeter round found on the floorboard behind the driver's seat, a live 9 millimeter round found on the seat, an AK

assault rifle found in the trunk, a bullet hole in the windshield, a spent shell casing found on the front passenger floor-board, and various items of clothing.

Ralph Looney, a latent fingerprint examiner for the San Antonio Police Department, testified that he identified fingerprints from Frank Johnson and Brooks which were lifted from the vehicle found at Hedges and Terrell Streets.

Tony Strong, an inmate of Bexar County Jail who was serving time for credit card abuse, testified that appellant told him that "if he had to do it again he wouldn't even lay down the gun."

■ Based on the above evidence, we reject appellant's sufficiency argument. The record evidence was sufficient to support the jury's finding of guilt beyond a reasonable doubt. Point of error 53 is overruled.

In point of error number twelve, appellant argues that the trial judge violated Texas Rule of Criminal Evidence 803(5) by admitting Taylor's statement into evidence. Appellant contends that the State failed to lay the proper predicate in support of admission of this evidence. The State argues that the predicate requirements of Rule 803(5) were met and that the testimony was properly admitted.

During the guilt/innocence phase of trial, the State called Taylor to the stand to testify as an eyewitness to the offense. Unfortunately for the State, Taylor was not cooperative:

Q. Mr. Taylor, could you please state your name for the record, please.

A. You already know my name.

Q. Could you please state it for the record, sir?

A. For what? You already know it.

Q. Is your name Reginald Taylor?

A. It's right there in front of you man.

Q. All I'm asking you, sir, is that your name?

A. Yeah.

---

**3.** Officer Keith testified that a "down and out" could be anything from a vagrant sitting on a curb, to someone sick or injured laying out.

Q. Okay.

PROSECUTOR: May I approach the witness, Judge?

THE COURT: You may.

PROSECUTOR: Thank you.

Q. Mr. Taylor, I'm going to ask you, show you State's Exhibit Number 120. Is that your signature, sir?

A. Yeah.

Q. Excuse me?

A. Yeah.

Q. Okay. And did you give that statement on October 26th, 1995?

A. I don't remember.

Q. Okay. It says October 26th, 1995. Do you have any doubt on that or would you say that's correct, sir?

A. I don't remember. I don't even know the date.

Q. Okay. When you gave the statement to Detective Hernandez, was everything true and correct when you told him?

A. I don't even remember what I said.

Q. You don't remember what you said?

A. I don't.

Q. You don't remember what you said? But when you told the officer—why don't you just go look over State's Exhibit Number 120, just read it over, okay?

A. Are you trying to make me memorize what I said?

Q. No, sir. Just go ahead and read it over, okay. There's the next page behind it, sir. If you can read that one, the second one and the third one, please. Mr. Taylor, the statement, 120, when you gave the statement to the police officers, was that more fresh in your mind at the time when you gave it, sir?

A. I really don't remember, just what I read. I don't remember what happened that day.

Q. Okay. You don't remember what happened that day?

A. No.

Q. Okay. But when you gave this statement to the police officers on October 26th, 1995, was it more fresh in your mind then as it is today?

A. I don't remember.

Q. Excuse me?

A. I don't remember.

Q. You don't remember what, sir?

A. About the statement, about what I just read.

Q. Okay.

*  *  *

Q. But when you gave the statement to the police officers, was it more fresh in your mind when you gave it to them? I'm not talking about today. You said today you can't remember that well. But what I'm asking you, when you gave the statement to the police officers, was it more fresh in your mind then?

A. I guess so.

Q. Okay. So it was more fresh in your mind then. Is that what your are telling me?

A. Yeah.

Q. And that's your signature, October 26th, 1995. That's what it says there, correct?

A. Yeah.

Q. And you are telling us you can't remember anything today. Is that what you are saying?

A. Right.

PROSECUTOR: Your Honor, at this time I would like to offer into evidence State's Exhibit Number 120 and cite to the Court 803(5), Texas Rules of Criminal Evidence.

DEFENSE COUNSEL: Defense would object on the grounds we are being denied to confront the accusers under the Sixth Amendment of the Constitution of the United States; Texas Constitution Article 1, Section 10, Texas Code of Criminal Procedures Article 1.05. There has been no reliability of the statement established whatsoever ... Further, they have not met the requirements under 803(5). It is still hearsay. It is hearsay within hearsay. It does not establish the circumstances that establish reliability of the statement whatsoever.

THE COURT: If I may see the attorneys at the bench. The objections are overruled, number one.

The State was then allowed to read Taylor's statement in its entirety into evidence to the jury.

Texas Rule of Criminal Evidence 803(5) provides in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \* \* \*
>
> (5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly, unless the circumstances of preparation casts doubt on the document's trustworthiness. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The predicate for past recollection recorded is set forth in Rule 803(5) and requires that four elements be met: (1) the witness must have had firsthand knowledge of the event, (2) the written statement must be an original memorandum made at or near the time of the event while the witness had a clear and accurate memory of it, (3) the witness must lack a present recollection of the event, and (4) the witness must vouch for the accuracy of the written memorandum. 2 J. Strong, et al., *McCormick On Evidence* §§ 279–283 (4th ed.1992). In particular, to meet the fourth element, the witness may testify that she presently remembers recording the fact correctly or remembers recognizing the writing as accurate when she read it at an earlier time. *Id.* at § 283. But if her present memory is less effective, it is sufficient if the witness testifies that she knows the memorandum is correct because of a habit or practice to record matters accurately or to check them for accuracy. *Ibid.* At the extreme, it is even sufficient if the individual

testifies to recognizing her signature on the statement and believes the statement is correct because she would not have signed it if she had not believed it true at the time. *Ibid;* 3 Wigmore, *Evidence* § 747 (Chadbourn rev.1970). However, the witness must acknowledge at trial the accuracy of the statement. 2 J. Strong, et al., *McCormick On Evidence* § 283 (4th ed.1992). An assertion of the statement's accuracy in the acknowledgment line of a written memorandum or such an acknowledgment made previously under oath will not be sufficient. *Ibid.* No statement should be allowed to verify itself, especially by boilerplate language routinely added by police, lawyers, or others experienced in litigation. 4 Louisell & Mueller, *Federal Evidence* §§ 445, 628–29 (1980).

We have addressed the past recollection recorded hearsay exception before. In *Wood v. State,* 511 S.W.2d 37 (Tex.Crim.App.1974), a murder prosecution, the State attempted to prove that the defendant made a threat regarding the victim in the presence of a witness. In holding the witness' written statement admissible under the past recollection recorded hearsay exception, we explained:

> [A]lthough the original statement was exhibited to the witness on several occasions, she consistently contended she had no present recollection of the appellant having made the threat in question just prior to the alleged offense. She did testify that, while the written sworn statement made to the police did not refresh her present recollection as to appellant's threat made before he entered the house where the killing occurred, she did give the statement on the "night" of the alleged offense, that she signed and swore to it and that if the statement reflected appellant made such threat it was true. It thus appears that rules of the use of a memorandum of past recollection were met. It was shown that the memorandum was made at or near the time of the event in question and that the witness guaranteed the correctness of the memorandum.

*Wood v. State,* 511 S.W.2d at 44. See *Young v. State,* 891 S.W.2d 945, 951 (Tex.Crim.App. 1994) (McCormick, P.J., dissenting)(noting that a writing may qualify as a past recollec-

tion recorded only if the witness can testify that he does remember that the writing is accurate); *Phea v. State,* 767 S.W.2d 263, 266–267 (Tex.App.-Amarillo 1989) (witness identified her signature on the statements and testified that the information contained therein was true at the time the statements were given).

■ Given the record before us, it is apparent that the State did not lay a proper predicate for the admissibility of Taylor's statement under Rule 803(5). As noted before, the Rule requires that four elements be met. In this case there was no testimony given to satisfy the first element requirement of firsthand knowledge. Taylor did not testify regarding the basis of the allegations contained in his statement, i.e., whether he was present during the commission of the offense. Nor was there any testimony given which supported the fourth element. Taylor never guaranteed that his memory was correctly transcribed or that the factual assertions contained in the statement were true. Consequently, the statement read into evidence was inadmissible hearsay.

■■ A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as whole, has fair assurance that the error did not influence the jury, or had but a slight effect. See Tex.R.App. Proc. 44.2(b); *King v. State,* 953 S.W.2d 266 (Tex.Crim.App. 1997). Given the record before us, we have no such fair assurance. The reference in Taylor's statement to an extraneous murder was highly prejudicial, as was the statement "shoot him in the head." We are unable to say with fair assurance that the erroneous admission of Taylor's statement did not influence the jury or that its admission did not affect appellant's substantial rights. Point of error number twelve is sustained.*

The judgment of the trial court is REVERSED, and the case REMANDED for a new trial.

BAIRD, MEYERS and HOLLAND, JJ., concur in the result.

---

KELLER and WOMACK, JJ., concur as to point of error one and otherwise join the opinion of the Court.

---

* Publish Points of Error Fifty–Three and Twelve (down to and including the first partial paragraph on page thirteen). Do Not Publish Point of Error One (from the first complete paragraph on page thirteen to the conclusion of the opinion).