Ben Wayne SCHUTZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–94–00257–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 27, 1999.

Frank Blazek, Huntsville, for appellant.

Kay Douglas, David Weeks, Huntsville, for State.

Panel consists of Justices COHEN, MIRABAL, and TAFT.

## OPINION ON REMAND FROM THE COURT OF CRIMINAL APPEALS

MARGARET GARNER MIRABAL, Justice.

A jury found appellant, Ben Wayne Schutz, guilty of the aggravated sexual assault of his six-year-old daughter, and assessed punishment at 30–years confinement. In an opinion and judgment dated June 1, 1995, this court affirmed the conviction. On appellant's petition for discretionary review, the Court of Criminal Appeals reversed our judgment, holding that the trial court erroneously admitted expert testimony concerning the credibility of the child complainant. *Schutz v. State*, 957 S.W.2d 52 (Tex.Crim.App.1997). The case has been remanded to this court to conduct a harmless error analysis.

In points of error four and five, appellant asserts the trial court erred by allowing a social worker (Patricia Burns), and a psychologist (Dr. David Poole), to testify about manipulation and fantasy, arguing that such testimony impermissibly bolstered the testimony of the complainant. The Court of Criminal Appeals ana-

lyzed each portion of the complained-about testimony and concluded that the following testimony was improperly admitted into evidence:[1]

1. Burns' testimony that "the complainant had not exhibited any evidence of fantasizing" was a "direct comment on the truthfulness of complainant's allegations" because Burns had not described any "traits" of fantasizing, but instead merely equated fantasizing with lying. *Id.* at 73.

2. Poole's testimony conveying to the jury his opinion that "complainant's allegations were not the result of manipulation" was a direct comment on the truthfulness of complainant's allegations. *Id.*

3. Poole's testimony that "complainant's allegations were not the result of fantasy" constituted a direct comment on the truthfulness of complainant's allegations. *Id.*

The Court pointed out that the credibility of a complainant's *specific allegations* has generally been considered an issue within the exclusive province of the jury. *Id.* at 68. Expert testimony must aid—not supplant—the jury's decision. *Id.* at 59. Expert testimony does not "assist" the jury if it constitutes a "direct opinion on the truthfulness" of a child complainant's specific allegations. *Id.*

◼ We will conduct a harmless error analysis under Texas Rules of Appellate Procedure rule 44.2 (Reversible Error in Criminal Cases). Because the error complained of does not involve a violation of the constitution, we apply the "other" error rule under TEX.R.APP. P. 44.2(b). *See Merritt v. State*, 982 S.W.2d 634, 636 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd, untimely filed). Accordingly, we must determine whether appellant's substantial rights were affected by the trial court's erroneous admission of the expert witness testimony. A substantial right is affected when the error has a substantial or injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 267 (Tex.Crim.App.1997).

In the present case, the complainant was six-years-old at the time of the offense, and nine-years-old when she testified. The two-paragraph indictment charged appellant with aggravated sexual assault by (1) penetration of complainant's sexual organ, and (2) contact between appellant's sexual organ and complainant's sexual organ. Complainant was the only eyewitness to testify the offense occurred. Appellant testified at the guilt-innocence phase and denied the charges. The jury found appellant "not guilty" of penetration as alleged in the first paragraph of the indictment, and convicted appellant of "contact" as alleged in the second paragraph of the indictment. In closing argument, the prosecutor told the jury:

> The Judge has just told you that you are the exclusive judges of the credibility of all of the witnesses. But what this really comes down to is one witness, [the complainant] ... She's all we have got. But you promised in voir dire that one witness would be enough.

Because the outcome of the trial of the charge of "contact" as alleged in the first paragraph of the indictment[2] depended on

1. As Justice Taft's dissenting opinion points out, much of the expert witness testimony of Burns and Poole was properly admitted into evidence. We note that Judge Womack argued in his concurrence in the Court of Criminal Appeals opinion that, in light of the properly admitted testimony of Burns and Poole, the jury would have inevitably known what the experts' opinions were regarding the credibility of the child complainant, *Schutz v. State*, 957 S.W.2d 52, 79 (Tex.Crim.App. 1997); however, a majority of the Court of Criminal Appeals specifically rejected Judge Womack's argument. *Id.* at 71.

2. As pointed out in the dissenting opinion, complainant gave detailed testimony regarding appellant's alleged "contact" with her, but her testimony regarding "penetration" was limited to answering "yes" once, and "no" twice, in response to leading questions from the State, which questions may not have been fully understood by the child complain-

whether the jury believed complainant or appellant, we conclude appellant's substantial rights were affected when the trial court improperly admitted opinion testimony regarding the truthfulness of complainant's allegations. Accordingly, harmful and reversible error was committed. TEX. R.APP. P. 44.2(b).

We sustain appellant's points of error four and five.

We reverse the judgment and remand the case to the trial court.

Justice TAFT, dissenting.

TIM TAFT Justice, dissenting on remand from the court of criminal appeals.

A criminal conviction should not be overturned for non-constitutional error if the appellate court, *after examining the record as a whole,* has fair assurance that the error did not influence the jury, or had but a slight effect." *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998) (emphasis added). Appellant claims that "[a]ny improper testimony that relates to [the credibility of the complainant and appellant] would be harmful." Additionally, appellant relies on the "nature" of the testimony as harmful, apparently relying on the likelihood that a jury would always be prone to be influenced by expert testimony. Merely asserting that inadmissible testimony is harmful does not provide the reasoning needed to meet appellant's burden to show harm under rule 44.2(b). *See Merritt v. State,* 982 S.W.2d 634, 636–37 (Tex.App.—Houston [1st Dist.] 1998, pet ref'd, untimely filed). Appellant offers no concrete reasons why the inadmissible portions of testimony were harmful to his substantial rights.

It is important throughout a harmless error analysis to keep in mind the potential for harm. The error, admitting erroneous expert testimony that is a direct comment on the credibility of the complainant witness, must not "supplant" the jury's decision. *See Schutz v. State,* 957 S.W.2d 52, 59 (Tex.Crim.App.1997). The expert testimony must merely aid or assist the jury in its deliberations and not stampede the jury into relying on the inadmissible statements of credibility. *See id.* We should examine the record as a whole, including the state of the evidence and contested issues, the argument of counsel, the charge of the court, and the jury's verdict.

**A. State of the Evidence**

The trial evidence consisted of testimony from expert witnesses and fact witnesses. Social worker, Patricia Burns, and psychologist, Dr. David Poole, provided admissible and inadmissible portions of expert testimony concerning manipulation and fantasizing. Dr. Kim Mosely and Dr. Darrel Wells then provided medical, expert testimony as to the injuries sustained by the complainant. The complainant's mother, Debbie Schutz, offered testimony as to the character of her daughter and her relationship with appellant. Additionally, the complainant and appellant provided factual testimony that supported their respective allegations and defense. Finally, appellant presented several character witnesses that testified on his behalf. We will examine the totality of the evidence below.

**1. Testimony of Social Worker, Patricia Burns**

**a. Unobjected-to Testimony**

■ Particularly in cases where there [have] been allegations of sexual abuse I believe that it's beneficial to just get the child's perspective without having anyone else there to influence her.

---

ant. In light of complainant's limited testimony, the physical evidence, the inconclusive medical testimony, and the initial report to the police, it is understandable that the jury had reasonable doubt as to the penetration charge. The acquittal on the penetration charge is not inconsistent with the jury's decision to believe the child complainant, rather than appellant, with regard to the "contact" testimony.

■ One thing that I try to do is clearly get the child to state in [her] own words from her own reality what is bothering her. That way the information is coming directly from the child and she is not being led in any way to tell a story.

■ In my interview with the child I try to very definitely assess if it's manipulation or fantasy or if what she is saying is, indeed, you know, valid.

■ There are several things that I try to observe, and that is I first of all pay attention to the event that a child is describing, the way that that child describes it. If it's done in an appropriate—age appropriate manner.

■ I feel like if the child is being manipulated and coerced into something that often times the language would be more sophisticated than a child that age would know.

■ I look for emotions and behaviors that are consistent with what she is describing or with what a child is describing. If a child is describing a situational sexual abuse then she many times will have a very distressed, painful expression of emotions, emotions where she would be exhibiting emotions that she does not realize that she is supposed to be exhibiting and describing in describing such events. So there is some parallel between the emotions she has and the event [she is] describing.

■ I [also] look for the description. I look at the child and her age. I examine her language and her knowledge of certain things. In the case of sexual abuse, if the child has an advanced knowledge in this area then it is indicative of something that perhaps did definitely occur.

■ I feel that if the child is being manipulated in a situation such as sexual abuse the behaviors that I would predict would be more of enthusiasm on the part of the child in telling the story where she would want to use the events and the happenings as a tool to get attention.

■ I do look at those behaviors. And, yes, I would predict that type of behavior. Or, as I said before, if I saw a child with her emotions did not match up to the events that she was describing I would examine that, also.

■ If I feel like there is a situation where the child is making up a story or fantasizing the story I will continue questioning the child's difficulties. I think my feeling is if a child is lying about something like this then that is what I need to get a handle on because that's just as big of a problem as, you know, telling the truth about this.

**b. Manipulation Testimony: Objected-to but admissible**

The State then asked the question that elicited the portion of testimony ruled admissible by the Court of Criminal Appeals.

Q. Based upon your experience, training, expertise, and the years you spent as a professional, the fact that you have treated [the complainant] on a weekly basis for some two years, based upon that do you have an opinion as to whether she is being manipulated into a story of sexual abuse?

Following a lengthy objection, the question was rephrased.

Q. Let me rephrase the question. Would you describe to the jury what the types of things that you would look for in a person that would be manipulating based upon your experience, training and expertise, based upon your close contact with [the complainant] over two years on a weekly basis. Do you have an opinion as to whether she has exhibited any of the traits of manipulation that you have described to the jury?

The question was asked again after another objection.

Q. Do you have an opinion as to whether [the complainant] exhibited any of those traits or characteristics of manipu-

lation that you have described to the jury?

A. My opinion is that [the complainant] has not exhibited—in my professional opinion she has not exhibited behaviors that point to having been manipulated.

### c. Fantasizing Testimony: Objected-to and Inadmissible

Ms. Burns was then asked specifically about her opinion on fantasizing.

Q. And based upon your experience, training and expertise, your close relationship and therapy with [the complainant], do you have an opinion as to whether she has exhibited any of the traits of fantasizing?

A. My opinion is she has not exhibited any evidence of fantasizing.

We observe that Ms. Burns's testimony regarding fantasizing was devoid of a basis during her earlier testimony by its failure to mention any traits that characterize a fantasizing or non-fantasizing child. More troubling to the Court of Criminal Appeals was Ms. Burns's earlier testimony which, although not objected to, appeared to equate fantasizing with lying.

### 2. Testimony of Psychologist, Dr. David Poole

#### a. Unobjected-to Testimony

■ If details are being alleged and they are known and it is good to know those things. As part of what I do, though, what I was saying is I don't normally interview the child about allegations, asking them if it happened or what happened and so on because someone else has usually done that. What I'm trying to do is get a look at the child's emotions to see what those patterns are consistent with, particularly in the context of those kinds of allegations.

■ (When asked about manipulation) Well, usually [sexually abused children] are accompanied by a caregiver or parent. And as part of the assessment—what I will normally do is take a child in. I will give her some of the tests right off the bat. I will have her look at ink blots, tell me what they look like. Show her some pictures of people doing different things and ask her to make up stories about them, what it looks like to her is going on and how it turns out in the end, draw some pictures and so on.

I also do an interview. If there is a divorce involved then I will usually ask them to tell me what they like about mom and don't like about mom and what they like about dad and what they don't like about dad. Talk about school some. What they would like to be when they grow up and those kinds of things. Then usually after that I will go out and I will interview whoever brought them, their history and find out where they were born and what the developmental stages were like when they started to crawl and that sort of thing and talk about school history.

See, basically what I'm after there is to see what was going on in the kid's life at certain developmental stages as they are growing up. And also to get more details about the allegations that they are aware of.

■ The point of the material that the kid generates in the testing has to do with what is on their mind. Usually if a kid is prepared to dispose of a relationship with one parent, trash it, be a party to getting them in trouble, they are usually coming under some significant pressure from some other source. The kinds of things that you will find the kid worrying about is the source of the pressure. If they are getting threats, if they are getting told they might get abandoned, nobody loved anymore, they will never see them again or pressure like that you will see the kid worried about losing a parent who would be putting the pressure on them. It's depending upon where their anguish and anxiety is coming from.

▪ Well, one of the aspects you look at in the testing is seeing if the reactions that the child has, the interpretation, shapes of the ink blots, the identification of the content of the picture has some relevance to what is really there. If they are talking about material that is actually depicted, if their perception of things is common and it's recognizable to other people, that is one of the ways you judge whether the kid is in touch with reality and whether their perception of what is going on has any similarity to what really is out there. It's one of those things we evaluate.

You usually find kids distorting those kind of interpretations in pretty dramatic ways if they are really out of touch with reality. And it's usually evident clinically in a lot of other different ways, too, if a child is so convinced about the reality of the situation that they're distorting what is really going on.

▪ (When asked if the focus would be on the abuser when a child is being sexually abused) Well—and I want to concede that you certainly have to take a lot of things into account. And talking in general terms, yes, that is commonly true, and that is consistent with what I was saying earlier that a kid's concern is—usually the focus of the kid's concern is usually what emerges in the testing data just like it does in their spontaneous comments, the kind of play they get involved in, what they watch on TV, what kind of dreams they have. The kind of spontaneous reactions and interest people have are related to things that are important to them. I think that is pretty manifest in their everyday experience.

### b. Manipulation Testimony: Objected-to and Inadmissible

The psychologist was asked next about his specific opinion on manipulation.

Q. Dr. Poole, based upon your experience, your training, your education in your profession, my question to you is do you have an opinion based upon your examination of [the complainant] whether she has been the subject of manipulation?

A. Yes

Q. And what is that opinion?

Objection was raised to this question based on an objection offered at the bench. The psychologist continued his answer in response to the objection.

A. The evidence I have available to me made that the less likely explanation.

### c. Fantasizing Testimony: Objected-to and Inadmissible

The last question proffered by the State elicited the third and final portion of inadmissible testimony.

Q. Do you have an opinion based upon your experience, training and expertise and examination of [the complainant] whether her allegations are the subject of fantasy?

A. My opinion is that they were not the result of fantasy.

### 3. Testimony of Mrs. Schutz

The only other testimony on the topics of manipulation or fantasizing came from the complainant's mother, Debbie Schutz. On recross examination by defense counsel, Mrs. Schutz testified as to the truthfulness and character of her daughter:

Q. Has [the complainant] always been a truthful person?

A. Very, very truthful.

Q. Has she ever fantasized or fabricated?

A. Nothing.

Q. Have you ever talked to her about her fantasies or ideas?

A. Nothing. In fact, she will not talk to me about this at all. The outcries that she made was very, very—it was like I said, just—it was very—it wasn't very in detail at all. And the outcry she had made to her counselor was -

Q. And you know -

A. She would not talk to me about it today.

Q. She won't talk to you?

A. About it at all, what happened or anything.

Q. Is it possible that she won't talk to you because it might not be true?

A. No, it's not possible. She doesn't want to hurt me any more than I been hurt. I believe that.

Furthermore, Mrs. Schutz accounted for the events that had transpired when she took her daughter to the police instead of a doctor. Detective David O'Rear was the police contact for Mrs. Schutz and her daughter.

Q. Who did you ask about taking [the complainant] to see a physician?

A. The therapist from—well, no, David O'Rear. [Mrs. Schutz and her attorney] had talked to David O'Rear and we wanted her to see a physician. And they thought that when she had talked to David O'Rear that it was just -

Following an overruled objection, Mrs. Schutz was allowed to continue her testimony.

A. Okay. We had talked to David O'Rear after my lawyer told me to go to the police department and file charges. That's immediately what I did. Then David O'Rear took me and [the complainant] in and questioned [the complainant] by herself and [the complainant] told enough that they filed the charges.

Q. Why didn't you take her to the doctor?

A. Okay. They said for us not to worry about a doctor, a physical, because it was just at that time she had only told him -

Following further objections, Mrs. Schutz was given the opportunity to complete her testimony.

Q. And [the police] said it was only what?

A. They said it was only fondling, that they didn't need a physical.

Q. And you later took her to Pat Burns, the therapist?

A. Yes. And when all that other came out then she advised us to go to a physician.

Q. And you did so?

A. Yes, I did.

Moreover, Mrs. Schutz testified that she had marital problems with appellant because he was too controlling, which subsequently resulted in their separation. Mrs. Schutz further stated that appellant's controlling behavior was due to religious beliefs that restricted Mrs. Schutz's freedom. Defense counsel attempted to draw a link between the marital problems and the truthfulness of the complainant.

### 4. Testimony of Dr. Mosely

Dr. Kim Mosely, a pediatrician, provided expert testimony that her examination of the complainant revealed tears of the complainant's hymen and red, healing lacerations on the sides of the hymen.[1] Dr. Mosely said that the irregularities she witnessed were consistent with a penetration-type injury. Specifically, Dr. Mosely testified that the laceration injuries were not fresh and had started to heal, and there was no physical evidence of scarring. When questioned on her ability to determine the timing of the lacerations, Dr. Mosely replied that they could have occurred anywhere from three days to six or eight weeks.[2] However, Dr. Mosely provided clarification for her statement by distinguishing that a time-frame cannot be judged from a torn hymen; only the lacer-

---

1. Dr. Mosely explained that the hymen is a thin layer of tissue that comprises the entrance of a female's vagina.

2. Dr. Mosely asserted that there could be some scarring with complete healing occurring within a few months. Additionally, the laceration usually will go away, but occasionally a scar may be visible.

ations could provide a reference of time based on their stage of healing.[3] Appellant's counsel requested Dr. Mosley to further explain what stage of healing she found complainant's lacerations. Dr. Mosely stated several times:

■ [The tissue] was starting to come together. You could still see a darker red area there. It was not completely healed when I saw it.

■ It had not completely grown together. It grows together cell by cell. So depending on how deep the cut, it heals from the bottom up and you see the tissue starting to come together but it is not completely healed, but you could still see a red line.

The State asked Dr. Mosely to draw a distinction between the timing of the lacerations and the tearing of the hymen.

Q. So even if the hymen, if there had been penetration of the hymen some time in the past, it has been torn there at the bottom, those cuts indicate that there was penetration within how long?

A. Within a minimum of two or three days up to several weeks.

Q. So even if this was an old injury, these were fairly recent?

A. Right.

Moreover, Dr. Mosely explained that, had the present injuries been the result of a previous, accidental, penetrating injury, such as a straddle-type injury,[4] then there would be bruising or cuts to the immediate surrounding area, the labia. Dr. Mosely found none. Dr. Mosely explained on cross examination:

■ Well, a typical straddle injury does not go into the vaginal area. If it is

something that enters the vagina, goes through the hymen, then it would tear it.

Dr. Mosely testified that sexual abuse cases require that the labia be open to provide entrance for penetration of the vagina.[5] No injuries to the complainant's labia were found by Dr. Mosely, thus diminishing the possibility of accidental, penetrating injury. When Dr. Mosely was questioned about the factual finding that the labia was not injured, she stated:

■ Well, for this injury to have occurred, the labia would have had to have been opened and the inner structures injured.

Using the aid of a blackboard, Dr. Mosely clarified her explanation by indicating that if the current injuries were sustained as a result from a fall:

■ This area would have been injured, also, and there would have been bruising or a cut on this part too.

At the conclusion of the State's direct examination, Dr. Mosely testified that in determining the size of whatever caused the present penetration injury:

■ I would say that it's either something that is larger than a hymen that tore the hymen or was forcibly introduced causing the tear.

During a discussion with appellant's counsel regarding the amount of lubrication secreted by a young child, Dr. Mosely made further reference to the importance of size as the factor in causing penetration injuries.

■ Well, there is still—there is enough lubrication there to do that. It's more the size that makes it difficult in a

---

**3.** Dr. Mosely testified that once the hymen is torn, it can never heal. There are multiple possibilities that might result in a torn hymen, therefore, the tearing may have occurred at any point during an individual's life. However, sexual assault ranks high among the possibilities causing a torn hymen among female children.

**4.** Straddle-type injuries are most commonly associated with bicycle accidents, where the tip of the bicycle's seat thrusts into the groin region.

**5.** The labia is the area of skin that protects the outside of the vagina. Therefore, in cases of accidents that involve penetration of the vagina, the labia would show some evidence of trauma.

young child. There are some secretions present. It's not the amount of secretions that make the penetration possible, it's the size of the opening.

On cross examination by appellant's counsel, Dr. Mosely was asked to describe what sort of dynamics would cause a cut in the specific tissue area of the hymen. She responded:

■ Well, in a thin tissue anything that forces that tissue apart could split it and cut it. [It would not] have to be anything sharp.

Counsel for appellant did not contest these findings, but limited his attacks to the questionable timing of the injuries. Moreover, appellant attempted to suggest that the injuries sustained by the complainant were the result of a clumsy, probing examination performed by the complainant's grandmother, who is a nurse. Dr. Mosely responded that appellant's suggestion could not happen unless something was forced into the vagina.

### 5. Testimony of Dr. Wells

Dr. Darrel Wells, an emergency room physician, rendered his expert opinion based on reports from other physicians. Dr. Wells did not perform a physical examination on the complainant. Rather, Dr. Wells was provided with medical report dated August 9, 1987 and September 10, 1991. The first report reflected that the complainant was medically treated for an accidental, penetration-type injury that resulted in a single laceration below the vaginal opening. The second report, concerning the current offense dated August 20, 1991, depicts the findings of Dr. Mosely, who performed a physical examination on the complainant. Dr. Wells's expert opinion emphasized that the injuries, as annotated in the examining physician's notes, were consistent with a sexual assault of some type. However, Dr. Wells could not draw a definite conclusion as to causation of the injuries or the timing of the torn tissue. Specifically, Dr. Wells conclusively stated that the healing lacerations discovered by Dr. Mosely could not be from the accident in 1987. In the course of four years, any lacerations received from the prior accident would have healed and disappeared, or resulted in a scar. Dr. Mosely did not indicate the presence of scarring in her medical report. Additionally, Dr. Wells supported Dr. Mosely's conclusion that there is a possibility that the complainant's torn hymen occurred during the 1987 accident. Likewise, it was impossible for Dr. Wells to determine a conclusory time-frame when the complainant's hymen was first torn. Dr. Wells stated that the healing lacerations were the result of some sort of penetration of the vagina, without a doubt.

However, Dr. Wells testified that he could not put a time-frame on the lacerations without seeing them. Appellant asked the witness if it is generally expected that scarring would occur in seven or eight days with some exceptions, even though he did not see or know the extensiveness of the wounds. Dr. Wells responded that there may not be significant scarring, but generally speaking, if the goal was to date the wound, then there exists an expectation of scarring to start in seven or eight days. However, Dr. Wells's explained that the mechanism of injury, the wound's characteristics, and personal hygiene are factors that could alter the timing that scarring would be expected to begin. For example, if there were an absence of first aid care, then it would take longer to heal than otherwise expected. Additionally, Dr. Wells stated that if the current lacerations were deep, wide wounds and care was improperly administered, then it is possible that the wounds could be two months old.

Furthermore, Dr. Wells offered two possible explanations for the evidentiary finding of redness that accompanied the healing wounds: (1) it is normal to the healing process; and (2) it could be attributable to repeated intrusion that would keep the wounds from healing. Appellant focused

on Dr. Wells's second explanation, if the wounds were prevented from healing, then it would make them older than they would appear at the time of examination. However, Dr. Wells opined that Dr. Mosely would be the most qualified to date the injury.

Appellant continued his cross-examination of Dr. Wells, while attempting to draw a relationship between the scarring of tissue, the healing of wounds, and the timing of the injury.

Q. So scarring is important, looking for scarring is important in relating to how old the injury might be?

A. Yes.

Q. And the older an injury is the more likely it is you are going to see scarring?

A. Yes.

Appellant tries to relate the absence of an annotation, in the examining physician's report, depicting scarring of vaginal tissue, to the time frame that appellant was last with complainant. Seemingly, appellant tried to imply that if he had sexually assaulted the complainant, then there would be evidence of tissue scarring due to the amount of time that had elapsed since appellant was last with complainant. Nevertheless, the examining physician's report seems to infer that the complainant's injuries are relatively recent, but the report does not provide a conclusion as to causation or timing, even though the wounds had started to heal. Likewise, Dr. Wells could not draw a similar conclusion. The issue of appellant's primary focus was not whether actual penetration had occurred, but the precise timing of the penetration.

### 6. Testimony of Complainant

The complainant's testimony provided detailed accounts describing contact, but limited answers to leading questions regarding the allegation of penetration.

#### a. Complainant's Testimony: Contact

Q. Now, you told the jury that [appellant] smothered you with a pillow and you were telling me what else he did.

A. One day whenever I needed to use the bathroom, because I needed to use it real bad, and he started [rubbing] his private and my private at the same time.

Q. Okay. What was he doing in the bathroom?

A. Taking a shower.

Q. And you had to go to the bathroom so you went in. Did you use the bathroom?

A. Yes.

Q. Okay. And then you stayed there?

A. Yes.

Q. Did [appellant] ask you to stay there?

A. Yes.

Q. If [appellant] was taking a shower did he have any clothes on?

A. No.

Q. Did you have clothes on?

A. Yes.

Q. What were you wearing?

A. A dress.

Q. Okay. Did he take your dress off?

A. Yes.

Q. Were you wearing panties?

A. Yes.

Q. Did [appellant] take those off?

A. Yes.

The complainant then demonstrated for the jury, through the aid of dolls, how appellant was rubbing both of their private parts at the same time. The complainant specifically indicated the areas that appellant had rubbed on both of their bodies. When questioned about a time when appellant and the complainant were alone in a bedroom on that same day, the complainant testified that they were clothed in their night clothes. She further stated:

■ He stuck a gun right here and right here and right there, and he said if I tell anybody that he would kill my family.

Q. He had a gun?

A. Yes.

Q. [Complainant], on that day in the apartment did your daddy's privates ever touch your privates?

A. Yes.

Immediately following this answer came the first direct question involving penetration.

**b. Complainant's Testimony: Penetration**

Q. Did [appellant] ever put—on that day in the apartment, did he put his privates inside of yours?

A. Yes.

No further testimony was given regarding the incident of penetration. The final question involving penetration was asked on redirect examination by the State.

Q. Has anyone other than Ben Wayne ever rubbed their privates against your privates?

A. No.

Q. Has anyone other than Ben Wayne Schutz ever put their privates inside of your privates?

A. No.

**7. Testimony of Appellant**

While appellant denied having committed any offense, his testimony failed to confirm or deny any of the details that the complainant described regarding her aggravated sexual assault. Appellant testified that he and the complainant went together to launder clothes on the afternoon of the offense. Furthermore, appellant testified that after the complainant and he spent an hour and a half doing laundry, they returned home together to put away the clothing. After being asked what else he did after arriving home, appellant answered that both he and the complainant cooked supper. Additionally, appellant testified that after they finished eating supper, they went to a seven o'clock prayer meeting. According to appellant's testimony, the only activity that occurred for two hours, after arriving home from the laundromat and before leaving for the prayer meeting, was cooking and eating a supper that was "something easy to [prepare.]" Appellant further testified that after an hour spent at the prayer meeting, and another half hour spent socializing, he and the complainant went to a pizza parlor to eat and socialize. After leaving the pizza place, appellant testified that he took the complainant home to her mother.

**8. Appellant's Character Witnesses**

Appellant presented five character witnesses. They all asserted, based on their observations and opinions, that appellant is a peaceful, truthful, and law abiding person. A majority of these witnesses also stated that appellant exhibited no unnatural sexual tendencies towards children.

Mr. Thomas Moreland, appellant's friend, testified that the interactions between appellant and his daughter appeared to represent a close and normal relationship. Mr. Moreland identified a single occasion, when appellant had performed some electrical work for him, where he and appellant had discussed family matters, but Mr. Moreland mainly limited his observations to church related social functions, such as gatherings at a pizza parlor on Sunday nights. Mr. Moreland's testimony never denoted an instance in which he observed appellant and appellant's daughter alone in a private or secluded situation. Moreover, Mr. Moreland testified that neither he nor appellant had ever had dinner at each others' homes. Mr. Moreland provided testimony regarding appellant's unnatural sexual tendencies by answering:

Q. Did you form an opinion as to whether or not [appellant] exhibited any unnatural or sexual attention toward young children or towards his daughter?

A. No, sir, to no one.

An additional friend to appellant, Mrs. Cheri Morris, provided brief testimony that she had also witnessed interactions between appellant and his daughter in public settings, specifically in a pizza parlor and at various church functions. Simi-

larly, Mrs. Morris's testimony was limited to public observations, and never included observations made in private or close intimate settings. When questioned about appellant's sexual tendencies, Mrs. Morris replied:

Q. Anything about his character or his reputation that would in any way make you think that he might have some sexual deviancy towards little girls?

A. No, never.

Moreover, appellant's college professor, Mr. Wesley Sanders, testified that his two-year substantive and recent period of contact with appellant was limited to academic and school settings, and has not had any interaction with appellant and his family other than mere introductions. When asked about appellant's sexual character traits, Mr. Sanders testified:

Q. Anything through all the years that you have known him which would indicate to you that he has any character trait that would make him inclined to any sort of sexual designs on any young person?

A. I don't know of anything like that.

Appellant produced further character testimony by Reverend Ron Smith who claimed he had a church relationship with appellant and spent many hours one-on-one with appellant. At no time did Reverend Smith testify that he spent the same one-on-one, quality time together with appellant and his daughter. Reverend Smith further testified that he had seen appellant interact with appellant's daughter at some point, and it appeared to be a normal parent/child relationship.

Additionally, Reverend Rondel Slatter testified on appellant's behalf and claimed that he had no contact with appellant or his family during the year that the incident occurred, thus he could not provide an accurate or legitimate account of appellant's behaviors during that time. Reverend Slatter could base his opinion and judgment of appellant only on prior affilia-

tions. Based on those prior affiliations, Reverend Slatter opined on appellant's possession of unusual sexual attractions towards children by answering:

Q. And can you see anything about him that made—that was any indication that he had any unusual sexual attraction to children or anything like that?

A. No, sir.

Appellant argues that his testimony was supported by "substantial character evidence." Even though appellant's testimony may have been supported, appellant's testimony was broad in its scope, and it was this same breadth of generalities that was supported by appellant's character witnesses. There was no specific testimony of instances that illustrated appellant's conduct with his daughter regardless of the setting. Rather, there was only testimony supporting appellant's religious affiliations and his general, behavioral appearance in public settings. Furthermore, the testimony of both appellant and his character witnesses never impeached, contradicted, or attempted to explain the specific events that occurred in the bathroom between appellant and his daughter.

**B. Contested Issues During Argument**

Heavy emphasis was placed by the State's argument on the complainant's ability to testify as to whether the incident in question occurred on or about a particular date. Specifically, the State argued to the jury that the date "had been a big deal in this case," and that the issue of " 'on or about' is so important in this case" when trying to determine the complainant's ability to pinpoint a specific date. During closing arguments, counsel for appellant stipulated to the State's argument that timing was important and further made multiple references to the importance of timing. When given the opportunity, counsel for appellant did not refute or mention the otherwise inadmissible testimony of the expert witnesses, but limited

defense argument and analysis to the issue of timing.

Moreover, appellant focused on the testimony of another expert witness, Dr. Wells, and the testimony of the child complainant, while only making brief reference to the general testimony of the social worker, Pat Burns. Counsel for appellant felt that Dr. Wells's testimony, regarding the scarring and tearing of tissue, was the crucial testimony in this case that questioned the timing of the event at issue.

While the State argued that there was no evidence of manipulation or fantasizing, the State did not emphasize the importance of the experts' inadmissible opinions.[6] The prosecutor stated in closing argument:

> The judge has just told you that you are the exclusive judges of the credibility of all the witnesses. But what this really comes down to is one witness, [the complainant] ... She's all we have got. But you promised in voir dire that one witness would be enough.

Therefore, the State continually guided the jury's attention toward the testimony of the complainant. Furthermore, counsel for appellant did not dissect the testimony of the experts, David Poole and Pat Burns. Rather, appellant's argument relied on the testimony of Dr. Wells and the complainant. Specifically, appellant argued that the injuries sustained by the complainant related to the lack of time that appellant could have inflicted those injuries, and that the lack of information in the complainant's testimony related to the completeness of her allegations.

**6.** During closing arguments, the prosecutor mentioned the opinions of Burns and Poole as supporting the complainant's testimony, but emphasized that it came down to the testimony of the complainant:

> In addition to [the complainant], though, we brought some witnesses to support her testimony. We brought Dr. Mosely who examined [the complainant] and said that the injuries that she saw in 1991 were consistent with penetration of the vaginal area.

## C. Charge of the Court

The charge of the court required the jury to consider first, and reject, the charge of penetration before considering the lesser included offense of contact.

## D. Jury's Verdict

During deliberations, the jury was given the options of finding appellant guilty of: (1) penetration of the complainant's sexual organ; (2) aggravated sexual assault by contact between appellant's sexual organ and the complainant's sexual organ; (3) indecency with a child; or (4) finding appellant not guilty. Had the jury found appellant guilty of the most aggravated charge of penetration, it would be easier to make the argument that the jury had been influenced by the experts' opinions of the truthfulness of the complainant's allegations.

### Summary

I reiterate that appellant has not presented any reasoned analysis demonstrating that his substantial rights were affected. Appellant apparently relies on an assumption that the inadmissible portions of testimony by the experts, Pat Burns and Dr. David Poole, boosted the credibility of the complainant.

In determining what evidence impacted the jury, which arrived at a verdict of guilt only as to aggravated sexual assault by contact, I would consider the following circumstances important:

1. The complainant's testimony was detailed when describing the contact, while the conclusory fact of penetration was only acknowledged

> You heard her testimony. We brought Dr. Poole, we brought Pat Burns, one of whom has spent a lot of time listening to [the complainant] and one of whom gave her some tests. And what they told you was that in their opinion there was no evidence of manipulation, there was no evidence of her fabricating, her fantasizing. We brought you those witnesses but you said one witness would be enough.

twice in response to leading questions;

2. Mrs. Schutz explained that the initial advice of the police, not to take the complainant to the doctor, was based on their belief that there was only a case for fondling, which did not require a physical;

3. The jury either ignored the medical, expert testimony regarding physical evidence of penetration, or gave appellant the benefit of the doubt as to the timing of the penetration;

4. The parties' arguments focused on the issue of the timing of the penetration injury suffered by the complainant;

5. As to the testimony regarding manipulation, there was at least as much admissible expert testimony as there was inadmissible expert testimony;

6. As to the testimony regarding fantasizing, there was Mrs. Schutz's testimony that the complainant did not fantasize, and the inadmissible testimony of Burns and Poole; and

7. Appellant's testimony generally denied committing an offense, but did not rebut the details the complainant described, including her going to the bathroom while he was taking a shower and his possession of a gun.

8. Appellant's character witnesses had only observed appellant and the complainant in social settings. None had observed appellant and his daughter when they were together in private or intimate settings.

My analysis leads me to believe that the jury's rejection of the complainant's testimony that appellant penetrated her, but acceptance of her testimony that appellant touched her, is based on the nature of the respective testimony of the complainant and appellant, and not on the inadmissible portions of the expert testimony of Pat Burns and David Poole. The issue of manipulation had the great-

est potential to cause harm due to the circumstances of marital separation arising between Mrs. Schutz and appellant. However, I note that the inadmissible portion of Poole's testimony regarding manipulation was cumulative of the arguably weightier, admissible portion of Burns's manipulation testimony, based on having observed characteristics of the complainant's behavior. Therefore, this limits the potential for harmful error to fantasizing, which was never a focus of conflict throughout the trial. Finally, I note that the only mention of the inadmissible expert testimony at argument was in the same paragraph as the medical, expert testimony that was not instrumental in the jury's verdict.

Appellant does not account for how the inadmissible testimony of Pat Burns and David Poole would have caused the jury to believe part, but not all, of the complainant's testimony. Having engaged in an extensive review of the evidence, contested issues, arguments of counsel, the court's charge, and the jury's verdict, I would conclude with a fair assurance that the inadmissible testimony did not influence the jury or that it had only a slight effect, and thus did not affect appellant's substantial rights. *See Johnson,* 967 S.W.2d at 417. I would hold that appellant has not shown that the inadmissible portions of expert testimony affected his substantial rights.

## Conclusion

Based on a thorough analysis of the entire record, I would overrule appellant's fourth and fifth points of error and affirm the judgment of the trial court. The majority opinion seems to accept appellant's bare assertion that the error was harmful because it must have impacted the jury's resolution of the conflict in testimony between appellant and the complainant, the only witnesses to the offense. Because this approach relieves appellant of the responsibility for showing harm, I respectfully dissent.

Chief Justice SCHNEIDER and Justices WILSON and NUCHIA join this opinion and dissent to the denial of en banc consideration.