Greg LONG, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–98–469 CR.

Court of Appeals of Texas,
Beaumont.

Submitted Oct. 7, 1999.

Decided Dec. 22, 1999.

Jarrod Walker, Conroe, for appellant.

Scott W. Rosekrans, Crim. Dist. Atty., Coldspring, for State.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

A jury found Greg Long guilty of felony theft and the trial court assessed punishment at ten years' confinement in the Texas Department of Criminal Justice—Institutional Division. Long was also assessed restitution in the amount of $105,488. The trial court suspended imposition of Long's incarceration and assessed him community supervision for a period of ten years. Long raises two points of error on appeal, *viz:*

Number One: The trial court erred in holding the evidence to be sufficient to sustain the conviction, because the evidence was insufficient to prove that the alleged stolen property was owned by the alleged owner, Steve McClain.

Number Two: The trial court erred while assessing punishment by setting the amount of restitution in a statutorily impermissible manner.

The basic facts developed at trial were that an illegal logging operation on property owned by the Thomas S. Foster Estate, a family owned business located in San Jacinto County, was discovered by Foster employees. Long was ultimately identified as being in charge of said operation. When confronted by Foster employees, Long produced a timber deed. Unfortunately for Long, the timber deed was for property adjacent to the Foster Estate property. Long's defense at trial was mistake of fact. *See* TEX. PEN.CODE ANN. § 8.02 (Vernon 1994). An instruction on mistake of fact was included in the trial court's charge to the jury.

At the outset with regard to Long's first point of error, we are concerned with his continued reference to the fact that his trial counsel made a motion for a directed/instructed verdict at the conclusion of the State's case-in-chief, that said motion was denied by the trial court, that the only evidence of McClain's ownership status in the State's case-in-chief was that McClain was the "general manager" of Foster, and that McClain "did not even testify during the case-in-chief." In short, the tone of appellant's argument under his first point of error is one of limiting appellate review of legal sufficiency to only the evidence produced by the State during its case-in-chief.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that every state criminal conviction be supported by evidence that a rational factfinder could find as sufficient to prove all elements of the offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 362–364, 90 S.Ct. 1068, 1071–73, 25 L.Ed.2d 368, 374–375 (1970); *Coit v. State,* 808 S.W.2d 473, 475

(Tex.Crim.App.1991). Tex. Pen.Code Ann. § 2.01 (Vernon 1994) contains the same requirement. When an appellant raises the question of the existence of legally sufficient evidence to support his conviction, the task of the reviewing court is to consider *all* of the record evidence, direct and circumstantial, in the light most favorable to the verdict, and to determine whether, based on that evidence, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Johnson v. State,* 967 S.W.2d 410, 411 (Tex.Crim.App.1998). In determining legal sufficiency of the evidence, the reviewing court considers *all the evidence,* both admissible and inadmissible. *Johnson,* 967 S.W.2d at 412. We therefore reject any implication on the part of Long that our review of the evidence is limited to only that elicited during the State's case-in-chief. The fact that Mr. McClain was called to testify during the State's case in rebuttal has no bearing on the law of legal sufficiency. That said, we now reproduce pertinent portions of the testimony of Steve McClain who was alleged as the owner of the stolen timber:

Q. [State's Attorney] And what is your current occupation?

A. [McClain] I'm an attorney.

Q. Is that there in Conroe?

A. Yes.

Q. And aside from that, do you hold any other jobs or responsibilities?

A. I am the manager of the— of Foster Management.

Q. And how long have you been the manager for Foster Management?

A. Approximately nine years.

Q. And is there a person by the name of Foster that you manage this property for?

A. No longer. Foster is— was the original person who acquired this land years and years ago. A family by a different name owns the property now.

Q. How did it fall upon you to be the general manager for Foster Management?

A. Just the fact that I have some knowledge in the timber management business and, also, in the area and most of the family members live away from here.

Q. I'm going to direct your attention to nine—- September the 3rd of 1997 and ask you if you had an opportunity to have a meeting in your office with Greg Long?

A. September the 3rd?

Q. Yes, sir.

A. I'm not sure of the exact date; but I did have a meeting with Greg Long in the Foster Management offices, yes.

Q. And was it after it had been discovered that timber had been cut off Foster property in San Jacinto County?

A. Yes, sir. That's correct.

Q. And in this meeting that you had with Mr. Long, was there a discussion regarding painted blaze marks on Foster trees?

A. Correct.

Q. And did Mr. Long acknowledge to you that he noticed the blaze lines?

A. Yes, sir. That's correct.

Q. Did he offer up any explanation as to why he cut on the other side of the blaze lines?

A. None at all.

Q. Now, at that time, did you tell him that Foster was out a considerable amount of money for the theft of the trees or the loss of the trees?

A. Yes, sir, *we* did.

Q. And did you ask him about making good for Foster's loss?

A. Yes, sir.

. . . .

Q. Now, early on the defense introduced a letter dated September the 15th that you sent to Mr. Long. Do you recognize that letter?

A. Yes, sir, I do.

Q. And in it there was a demand made to him for $117,000. What would be included in that $117,000?

A. The price of the timber, obviously; cost of regeneration because of the fact that their tract was basically barren after the work was done. Also, the cost of the hours that the Foster personnel took in having to go out and inspect the damage, which was many, many hours. Also, talking to parties involved. Also, at that time, *we* had just had an increase on the timber prices. So, that was factored in, also. After— after *we* used that number, it was later decided *we* should use the number of the value of the timber and the price *we* were getting at the time the timber was actually cut and that is another factor as to why it was less involved now.

Q. And that figure was what?

A. $80,000—some odd.

Q. Did you receive any response back from Mr. Long regarding this letter dated September the 15th of 1997?

A. No response.

. . . .

Q. [Long's Trial Counsel] Okay. And tell the ladies and gentlemen of the jury, again, how long you have been general manager for Foster.

A. Approximately nine years.

Q. Nine years. Now, is Foster a pretty big entity?

A. No, sir.

Q. Well, maybe I didn't state that very well. Do you know how many employees Foster has?

A. Four full-time employees.

Q. Foster only has four full-time employees?

A. That's correct.

. . . .

Q. Did you have him indicted?

A. I haven't had Mr. Long indicted.

Q. Did you bring it to the district attorney's office about Mr. Jackson?

A. *We* brought the entire complaint to the district attorney's office; and he made the decision as to who would be indicted, along with the grand jury.

Q. Now, this figure, this $117,000, I believe your testimony was that you arrived at that figure from work done by employees of Foster and the price of the lumber and the like, correct?

A. Yes, sir. That's correct.

Q. All right. Now, those trees aren't worth much sticking in the ground, are they? They have got to be taken to the mill and milled for them to be turned into money, don't they?

A. The trees become more valuable every day that they are in the ground.

Q. All right. But if I was going to make money off of timber, I would have to cut them down, haul them to the mill, and have them made into boards, right?

A. *We* are not involved in making them into the boards. *We* are involved in selling them to the mill.

. . . .

Q. When you were arriving at this number that you were asking for Mr. Jackson and Mr. Long to pay to Foster, did you—— did you get into—— did you factor in the price of skidders and loaders and trucks to haul them to the mill and folks to—— saw hands and those folks out there to saw them down and all that stuff? Did you factor all that in?

A. Certainly did. That would have been the price that the Foster Estate should have received, less the amount of regeneration, less the cost of the employees having to be involved in this situation.

Q. All right. Would it surprise you if you learned that all of the timber that was taken off of any of that property out there that it was only paid $83,000 from the mill? Would that surprise you?

A. No. It wouldn't surprise me at·all.

Q. All right. And that wouldn't include and that's—— that doesn't include

all the costs that it would take to get the logs to the mill? That was just the money that the mill paid when they arrived there back last summer?

A. What you have got to remember is the Foster Estate price that *we* receive for timber is not necessarily the same price that Mr. Long received for timber. What I am telling you is that number of $86,000 or $80,000—some-odd is the price that the Foster Estate would have received net profit if it had been *our* timber *we* had sold and *we* had received the money.

Q. All right. Now, this is—— this is your opinion, correct?

A. No. It's not my opinion. It's a fact.

Q. Well, do you have anything here to show this jury how this is a fact other than just your opinion about what you would get for it?

A. I have my nine years of experience knowing the price that *we* were receiving at the time and the amount of volume of timber that was taken off of the tract.

Q. Well, sir, would you agree with me that's just your opinion?

A. No, sir. It's a fact.

[Emphasis ours]

TEX. PEN.CODE ANN. § 1.07(a)(35)(A) (Vernon 1994) defines "owner" as a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor. Section 1.07(a)(39) defines "possession" as actual care, custody, control, or management. TEX. PEN.CODE ANN. § 1.07(a)(39) (Vernon 1994). Therefore, under the penal code definitions, anyone who had a greater right to possess, control, or manage the stolen timber in question than Long could be alleged as the "owner" of said timber. When the property referred to in an indictment is the property of a corporation, it is permissible to allege ownership in some natural person acting for the corporation. *Compton v. State*, 607 S.W.2d 246, 248 (Tex.Crim.App.1979). To show corporate ownership, it is sufficient to allege ownership in a "special owner," an employee who has care, custody, and control of the property. *Harrell v. State*, 852 S.W.2d 521, 523 (Tex.Crim.App.1993). Whether an alleged owner had title, possession, or a greater right to possession is not a necessary component of the indictment. *Villalobos v. State*, 951 S.W.2d 232, 234 (Tex.App.—El Paso 1997, no pet.). The State is not required to explain in a theft indictment why a particular person (or entity) was named as owner of the stolen property. *Id.*

In *Dingler v. State*, 705 S.W.2d 144 (Tex.Crim.App.1984)(opinion on rehearing), the majority, on rehearing, adopted Judge Campbell's dissenting opinion as the opinion of the court. *Id.* at 150. In his dissent, Judge Campbell observed that the majority initially held that "before a conviction might be sustained, and it is alleged that a particular person 'owned' the property, it is essential that the prosecution establish the *relationship* of the alleged owner to the *property.*" *Id.* at 148. [emphasis in original] Judge Campbell then went on to explain why the majority's holding was flawed based upon the establishment of the fact of an employment relationship between the alleged owner and the business entity which actually had legal title to the property in question. In *Dingler*, the alleged owner, one Jervis White, testified that he was a store manager of a store which was part of the business entity which had legal title to the vehicle in question. *Id.* at 149. Judge Campbell then focused on the portion of White's testimony during the trial when he (White) answered "yes" to the State's question concerning whether or not one of "his" vehicles was burglarized. Judge Campbell observed that it was clear that the term "his" meant a vehicle belonging to his employer, the business entity. *Id.* Judge Campbell immediately thereafter provided this factual summary:

Additionally, the evidence is totally uncontroverted that White did not give the appellant any consent or permission to enter the vehicle and that "we (Shanks) [the business entity] maintain about five trucks and two Econolines" in the downtown warehouse location. Where, as here, there has been no objection to such testimony and no evidence to prove the contrary as to ownership, the evidence should be clearly sufficient to show White as the special owner. [citation omitted]

*Id.* Judge Campbell ended this summary by concluding that because of White's testimony and his employment relationship to the business entity, White had a greater right to possession of the vehicle burglarized than did the defendant. *Id.*

In his brief, Long cites us to *Freeman v. State,* 707 S.W.2d 597, 603 (Tex.Crim.App. 1986), for the proposition that proof of a management position alone is insufficient to sustain an ownership allegation absent some showing that the named owner had exercised some degree of care, custody, control, or management over the stolen property. However, the facts in *Freeman* are quite distinguishable from those in the instant case in that in *Freeman* the defendant was a sales clerk employed by the business entity which actually owned the stolen merchandise while the alleged "owner" was the security manager employed by the same entity. *Id.* at 600–601. After an extensive analysis of the law surrounding the meaning of "owner" and then applying said analysis to the facts before it, the *Freeman* Court reached this conclusion:

However, in this instance, the evidence established as a matter of law that the *appellant* was an "owner" of the property, as that term is statutorily defined, and that, as between her and Bourke, [the security manager] she had just as much, if not more, right to possession of the property as did Bourke. Viewing Bourke's testimony in the most favorable light, all that it established was that because of her relationship to the Sears & Roebuck store, as a security guard, she has a possessory interest in the merchandise that was allegedly stolen, but her testimony itself, standing alone, actually negates that she had a greater right to possession of the property than did the appellant— at least until the appellant relinquished the unpaid for merchandise to Stroud [a coconspirator].

*Id.* at 605. [emphasis ours] Nevertheless, the Court affirmed the conviction in *Freeman* by finding that the accused exercised " 'unauthorized' control over the property." *Id.* at 605–606. Because of the very unique facts and employment relationships present in *Freeman,* which obviously gave the Court great consternation, we believe *Freeman* should be rarely cited as authority for a clear pronouncement on the law regarding legally sufficient proof of "owner" in theft cases.

In the instant case, it is abundantly clear from the testimony of Mr. McClain, as set out above, that he had been employed by Foster Management for nine years, that he had very specialized knowledge of not merely the timber industry in general but the specific market price for Foster timber, and that he specifically knew what the market price would have been had Foster been able to sell the stolen timber in question to the mills instead of Long. This is certainly not testimony merely indicating that McClain was Foster's general manager. Further sprinkled throughout McClain's testimony was his use of the terms "we" and "our" when referring to actions he took on Foster's behalf regarding the timber. All of this is to say that the testimony reflects an abundance of evidence to support the fact that McClain had a possessory interest in the stolen timber, that McClain had a greater right to possession of the stolen timber than Long, and that, at the very least, by his actions in the wake of the discovery of Long's complicity in the theft of the timber, McClain exercised care, custody, con-

trol, and management over the stolen timber.

As further proof of the evidentiary sufficiency of McClain as owner of the stolen timber, Long did not claim at trial, nor does he now on appeal, that he had any interest in the stolen timber. It is also uncontroverted that McClain did not give Long permission to cut Foster's timber and haul it off to the mill. The record contains absolutely no evidence contesting ownership of the timber in McClain. Based upon the state of the record before us, there is no question that McClain, or any employee of Foster Management for that matter, had a greater right to possess the stolen timber than did Long. As such, taking the evidence in the light most favorable to the verdict, any rational trier of fact could have found McClain to be the "owner" of the stolen timber beyond a reasonable doubt. Long's first point of error is overruled.

■ The resolution of Long's second point of error is provided by the recent case of *Campbell v. State*, 5 S.W.3d 693 (Tex.Crim.App.1999). In *Campbell*, the defendant pleaded no contest to theft of property valued at $20,000 or more but less than $100,000 for an offense which took place prior to September 1, 1994. At that time, said offense was a second degree felony. The trial court sentenced Campbell to ten years' confinement and recommended restitution as a condition of parole. *Id.* at 695–96. The amount of restitution recommended by the trial court was $100,000. Among the points Campbell raised on direct appeal to the Fourteenth Court of Appeals was a complaint that the amount of restitution recommended by the trial court exceeded the upper limit of the property-value range of the theft for which Campbell was convicted. The Court of Appeals agreed and struck the trial court's restitution recommendation as an abuse of discretion because it exceeded the "parameters of the offense." *Campbell v. State*, 942 S.W.2d 738, 740–741 (Tex.App.—Houston [14th Dist.] 1997, pet. granted). The Court of Appeals reasoned that second degree felony theft by definition involves stolen property valued at less than $100,-000, so a restitution recommendation in excess of that amount would have been permissible only if the defendant had been charged with first degree felony theft. *Id.* at 740.

In reversing the Court of Appeals, the Court of Criminal Appeals first discussed the limits on restitution orders in general. *Campbell*, at 696–97. The Court initially observed that the amount of restitution must be just, and it must have a factual basis within the loss of the victim, citing *Cartwright v. State*, 605 S.W.2d 287, 289 (Tex.Crim.App.1980). Since Campbell had stipulated to the amounts he stole from his victims to be $108,324.56, the amount of restitution recommended by the trial court had a factual basis in the record. *Id.* In the instant case, testimony during the punishment phase of the trial from Mike McNamara, the forester employed by Foster Management, indicated that the value of the stolen timber was $86,000, and the cost to restore the tract of land back to its original condition (regeneration cost) was testified to be $19,488.

■ The *Campbell* Court next observed that while a trial court may not order restitution for an offense for which a defendant is not criminally responsible, one is never "criminally responsible" for an amount of restitution; instead, criminal responsibility is assessed for the conduct that forms the basis for the trial court's discretionary award of restitution. *Id.* at 696–99. In the instant case, there is no question that Long was found to be criminally responsible for the theft of the stolen timber. We now set out the following pertinent portion of *Campbell* which, we feel, effectively disposes of the issue before us:

At common law, the power to impose restitution rested with the judge. See *Green v. State*, 880 S.W.2d 797, 802 n. 7 (Tex.App.—Houston [1 Dist.] 1994).

Since then, the authority to impose restitution has remained by statute with the judge. See supra note 5 and accompanying text. This does not mean that the judge is free to impose any amount of restitution independent of the trial record. The jury's factual findings are part of the record, so the trial judge should consider those findings when determining the just amount of restitution. Given the clear statutory charge to the trial judge to determine the just amount of restitution, however, the judge may determine from the record that the actual loss of the victim exceeds the property-value range of which the jury convicts the defendant. Although the current restitution statute is not before us, this interpretation of its predecessor has the added benefit of comporting with the current statute and providing guidance to the lower courts on the wide range of appropriate considerations available to the trial judge in awarding restitution. *Id.* at 698–99. [footnotes omitted]

TEX.CODE CRIM. PROC. ANN. art. 42.037(c) (Vernon Supp.2000), the current statutory scheme dealing with restitution, provides:

(c) The Court, in determining whether to order restitution and the amount of restitution, shall consider:

(1) the amount of the loss sustained by any victim as a result of the offense;

(2) the financial resources of the defendant;

(3) the financial needs and earning ability of the defendant and the defendant's dependents; and

(4) other factors the court deems appropriate.

The *Campbell* Court sees a "clear policy of the state to restore victims financially" in the various statutory provisions providing for restitution. *Id.* at 699–700. Because article 42.037 provides the trial court with very broad discretion in the awarding of restitution, including determining the amount, we find in the instant case that the trial court was well within its discretionary boundaries in including the cost of regeneration, $19,488, in the total amount of restitution awarded to Foster Management. Long's second point of error is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.

DON BURGESS, Justice, concurring and dissenting.

I respectfully disagree with the majority's decision to discount the precedent set by the Court of Criminal Appeals in *Freeman v. State,* 707 S.W.2d 597, 603 (Tex. Crim.App.1986). In *Freeman,* the Court of Criminal Appeals found that where the accused does not assert a possessory interest in property allegedly stolen, but the State proves that another had a possessory interest in the property, then, as a matter of law, between the two, the latter has established that he had the greater right to possession of the property, and in turn the State has established a prima facie case of ownership. *Id.* at 605.

In the present case, Long did not claim to have a possessory interest in the property. However, the State failed to establish that McClain had a greater right to possession of the timber than did Long. The evidence was that McClain is a self-employed attorney and is the general manager of Foster, the company that owned the stolen timber. McClain wrote checks for Foster and demanded payment from Long for the stolen timber. There is no evidence in the record indicating that McClain had any type of actual care, custody, control, or management over the stolen timber.[1] Although the State established that he is the general manager of the Foster Estate, that evidence alone is insufficient to sustain an ownership allegation absent some showing that McClain exer-

---

1. McClain testified at trial that he was manager of Foster. However, he did not state whether he possessed any type of ownership interest in the timber or as to whether he had any degree of care, custody, management or control whatsoever over the timber.

cised some degree of care, custody, control, or management over the stolen property. See *Freeman*, 707 S.W.2d at 603. After viewing the evidence in the light most favorable to the verdict, I believe a rational trier of fact could not have found McClain was the owner or special owner of the property. Accordingly, I would reverse the judgment of the trial court and order an acquittal. See *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

I concur with the majority's disposition of Long's second point of error. The majority finds it was within the trial court's discretion to include the cost of regeneration, $19,488, in the total amount of restitution. In doing so, the majority takes the position the trial court has unlimited discretion in ordering restitution. This is incorrect. There must be a factual basis in the record for the amount recommended. See *Campbell v. State*, 5 S.W.3d 693, 696–97 (Tex.Crim.App.1999). The record reflects that Mike McNamara testified it would cost Foster Estate $19,488 to replant the 56 acres Long clear-cut. According to McNamara, Foster ordinarily uses a selective management method, only cutting so many trees per acre, so that replanting is not required. Because there was evidence that the costs of regeneration would not have arisen in the normal course of Foster's operations, the trial court did not abuse its discretion in including that amount in the restitution ordered. For that reason, I would overrule Long's second point of error.