# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-06-00530-CR

Wardell Moore, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT
NO. 2005R-027, HONORABLE DAN R. BECK, JUDGE PRESIDING

## MEMORANDUM OPINION

The jury convicted Wardell Moore of the offense of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2) (West Supp. 2006). Punishment was assessed at 75 years' imprisonment. In a single point of error, Moore challenges the admissibility of evidence relating to a prior aggravated assault conviction. We affirm the judgment.

## BACKGROUND

The jury heard evidence that in the early morning hours of January 30, 2005, Schulenburg Chief of Police Randy Mican was dispatched to the residence of Evelyn "Bonnie" Wright in response to a 911 call. According to the testimony of the 911 operator who received the call, the caller, who did not identify herself, reported that Wright's throat had been cut by Moore. An audiotape recording of the 911 call was played for the jury.

Chief Mican testified that Moore was present when he arrived at the crime scene and that Mican immediately took Moore into "protective custody" because several people were standing around the house who "seemed to be hostile" towards Moore. When he took Moore into custody, Mican "noticed blood on [Moore's] hands." There was also blood on Moore's shirt. Blood samples taken from Moore's shirt later tested positive for Wright's DNA.

Stacey Martin, another Schulenburg police officer, later arrived at the scene. Martin checked on the status of the victim inside the house, determined that Wright's injuries were severe, and called a medic to ensure that Wright was transported to the nearest hospital. Later, Martin had a conversation with one of the bystanders, Freddie Ray Houston, who told him that the weapon Moore used to cut Wright was in the backyard and then pointed it out to him. Martin identified the weapon as a box cutter. Chief Mican also observed the box cutter that night and testified that it had blood on it. Samples of the blood tested positive for Wright's DNA.

Several witnesses testified about events prior to the officers' arrival at Wright's house. Moore's brother, Robert, testified that he had walked by the house on the night in question and visited with Ms. Wright. Robert testified that when he was talking with Wright, he saw that his brother was also in the house. Robert noticed that Moore had a box cutter "at the bottom of his leg." This concerned Robert, and he testified that he warned Wright that Moore had a box cutter. According to Robert, Wright responded that she was not worried about Moore.

Wright also testified. She explained that both Moore and another man, Allen Jackson, were living at her house around the time of the incident. All three of them had been at a party that evening. Each of them returned home separately at different times. Wright testified that,

2

after Moore arrived home, she was in the kitchen cleaning. Jackson was in his bedroom and Moore was in the living room. As Wright was about to put some beer into her refrigerator, Moore came into the kitchen and told her, "Don't touch that [expletive] beer." Wright responded, "Wardell, this is not your beer." However, because Moore sounded drunk, Wright decided to let him have the beer and turned around to wash the dishes. Wright testified that Moore came up behind her and told her that if she touched the beer, he was going to cut her throat. Wright did not believe him and continued washing the dishes. The next thing Wright knew, she felt something warm across her throat. She thought it was sweat. She reached up, wiped her throat, and saw that it was blood. Wright testified that she turned around and saw that Moore was "fixing to cut again." She threw her arm up to defend herself and Moore cut her across her arm. Wright then fell backwards into the refrigerator as Moore continued "slashing" at her. Wright testified that she did not remember anything after that.

Allen Jackson testified that he found Wright lying on the floor with her throat slashed, cut in several places. Jackson also testified that he saw Moore standing near her with a box cutter. Jackson told Moore that he needed to leave, and, according to Jackson, Moore went outside. Jackson also left the scene and began running from house to house to find a phone so he could call 911. During Jackson's testimony, as will be discussed in more detail below, the State introduced evidence of Moore's prior conviction for aggravated assault in an altercation involving Jackson.

Two of the bystanders at the crime scene, Freddie Ray Houston and his sister, Tameka Houston, also testified for the State. Freddie Ray testified that Allen Jackson ran over to his sister's house, where Freddie Ray was staying that night, and told him that Moore had cut Wright's throat.

3

Freddie Ray informed Tameka of Jackson's statement. Tameka called 911, and the pair then went to Wright's house. Both Freddie Ray and Tameka recounted that once they arrived at the house, they could see Wright through the front door, holding her throat and "walking around staggering, trying to get to the door." Freddie Ray tried to open the door, but Moore, who had apparently re-entered the house, "jumped from behind the door and swung a blade" at him. According to Freddie Ray, Moore told him, "Get back. You're not getting in." At this point the police arrived and, Freddie Ray testified, Moore "ran out the back door and pitched the blade." At trial, Freddie Ray testified that, after Moore was arrested, he asked Moore if and why he cut Wright's throat. According to Freddie Ray, Moore at first denied such acts, but then started smiling and admitted, "It was over a beer." Freddie Ray testified that he did not have any doubt that Moore cut Wright's throat.[1]

The jury convicted Moore of aggravated assault with a deadly weapon and punishment was assessed at 75 years' imprisonment. This appeal followed.

## DISCUSSION

In a single point of error, Moore argues that the district court abused its discretion in admitting evidence relating to his prior conviction for aggravated assault. The evidence at issue was admitted during Jackson's testimony. During Moore's cross-examination of Jackson, the following exchange occurred:

---

[1] Three other witnesses, Chief Mican, Tameka Houston, and Moore's brother, Robert, also testified that they did not have any doubt that Moore cut Wright's throat. Moore objected to this testimony from Chief Mican, but the district court overruled the objection. Moore did not object to this testimony from the other witnesses.

4

Q:     Have you had disputes with Mr. Moore, Wardell Moore?

A:     Have I had disputes with him?

Q:     Yes.

A:     Not as I recollect.

Q:     Were you all on friendly terms?

A:     Well, just a hi and bye terms.

Later, Moore again asked Jackson about his prior relationship with Moore:

Q:     You ever had a fight with Mr. Wardell Moore?

A:     What does that have to do with this case?

Q:     I'm just asking you.

A:     I never had a fight with Wardell Moore.

Immediately after this exchange, Moore passed the witness and the State asked for a bench conference. The State argued to the district court that Moore had "opened the door" for admitting evidence relating to Moore's prior conviction for aggravated assault in an incident involving Jackson. Moore disagreed, arguing that Jackson's denial of the fight prevented the door from being opened. The district court agreed with the State: "I think it did open the door. We will let you talk about it." The State then proceeded to ask Jackson in redirect:

Q:     Okay. Mr. Halpain asked you some questions about you getting into a fight
       with Wardell Moore. Have you ever fought with Wardell Moore?

A:     No.

Q:      But there was an incident between you and Wardell Moore, right?

A:      There was an incident, yes.

Q:      In fact, Wardell Moore - you have testified against him before, haven't you?

A:      Yes. On my own personal case.

Q:      Okay. That was a criminal case, wasn't it?

A:      Yes.

Q:      In fact, that scar on your chin, that's a cut that Wardell Moore did to you, isn't it?

A:      Yes.

Q:      Wardell Moore was convicted of doing that, wasn't he?

A:      Yes, he was.


Moore did not object to any of this testimony. The State then proceeded to show Jackson pictures depicting his injuries[2] and asked Jackson to identify the pictures:


Q:      Okay. And all three of those pictures are different angles of the wound that you received from Wardell Moore?

A:      Yes.

Q:      What did Wardell Moore use to cut you?

A:      A box cutter.

---

[2] Moore objected to the admission of the pictures, stating without explanation, "It deals with a prior issue that I think you barred from these proceedings." The district court overruled this objection.

6

Q:     Okay.  When Wardell Moore was convicted, he went to the penitentiary, correct?

A:     Yes.

On appeal, Moore objects to the admission of his prior conviction on the basis of rule of evidence 609(a).  Rule 609(a) provides:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.

Tex. R. Evid. 609(a).

We first note that rule 609 applies to situations in which the *witness* has been convicted of a crime and the proponent of the evidence is seeking to attack the credibility of that witness.  That was not the situation here.  Jackson was the witness, not Moore, and the State introduced Moore's prior conviction not as impeachment evidence, but as extraneous offense evidence under rule 404(b).  Rule 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 404(b).  The record reflects and Moore does not dispute that the State provided Moore with reasonable notice of its intent to introduce extraneous offense evidence.

Before turning to admissibility, however, we must address the State's contention that Moore failed to preserve error on that issue. To preserve error, the complaining party must make a timely, specific objection and obtain a ruling on the objection. *See* Tex. R. App. P. 33.1(a). The objection must be made at the earliest possible opportunity. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). The point of error on appeal must correspond to the objection made at trial. *Carmona v. State*, 941 S.W.2d 949, 957 (Tex. Crim. App. 1997). To preserve error related to the admission of extraneous offenses, the defendant must timely object that the evidence is inadmissible under rule 404(b), at which point the State must show that the proffered evidence is relevant apart from its tendency to show that the defendant is a criminal. *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992). If the trial court determines that the evidence is relevant, the defendant must object further under rule 403. *Id*.

Moore did not make objections under rules 404(b) or 403. In fact, during the bench conference, Moore failed to state a specific objection to the evidence or argue a specific reason why the evidence was inadmissible. Moore did not argue that the evidence was irrelevant, more prejudicial than probative, or improper for any other reason. Instead, Moore simply argued that his questions and Jackson's testimony did not "open the door" to evidence about Moore's prior conviction. Moore lodged no other complaints. Additionally, all of Jackson's subsequent testimony about Moore's prior conviction was admitted without a single objection from Moore. Moore objected only to the later admission of the pictures of Jackson's injuries, and even this objection was vague, with Moore simply stating, "It deals with a prior issue that I think you barred from these proceedings." We agree with the State that Moore failed to preserve error.

But even assuming that Moore preserved his complaint, any error in admitting the evidence would not be reversible because it was harmless. The erroneous admission of evidence is nonconstitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Nonconstitutional error that does not affect substantial rights must be disregarded. *See* Tex. R. App. P. 44.2(b). There was considerable evidence establishing Moore's guilt apart from Moore's prior conviction. *See Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002) ("[E]vidence of the defendant's guilt is a factor to be considered in any thorough harm analysis."). Ms. Wright, the victim, identified Moore as her attacker and described his attack in graphic detail. Multiple witnesses, including Moore's brother, Chief Mican, and Freddie Ray and Tameka Houston, were allowed to testify that they had "no doubt" that Moore cut Wright's throat. Jackson testified that when he found Wright on the ground, Moore was standing near her with a box cutter in his hand. Freddie Ray and Tameka Houston testified that Moore prevented them from entering Wright's house when they arrived and tried to help her. Freddie Ray testified that Moore swung a "blade" at him when he tried to open the door. Freddie Ray was also allowed to testify that, when he asked Moore if and why he cut Wright's throat, Moore at first denied such acts, but then started smiling and admitted, "It was over a beer." Officer Mican testified that when he placed Moore in custody, Moore had "blood on his hands." Furthermore, blood found on Moore's shirt and the box cutter found at the scene tested positive for Wright's DNA. Additionally, we note that the State did not emphasize Moore's prior conviction. In fact, the State did not even mention it during its closing argument. *See id*. at 356 (whether State emphasizes error is factor to be considered in harm analysis).

We overrule Moore's point of error.

# CONCLUSION

Having overruled Moore's point of error, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:  August 9, 2007

Do Not Publish