ACCEPTED
03-14-00228-CR
5444092
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/28/2015 7:50:44 AM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00228-CR

## IN THE COURT OF APPEALS
## FOR THE
## THIRD SUPREME JUDICIAL DISTRICT OF TEXAS
## AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/28/2015 7:50:44 AM
JEFFREY D. KYLE
Clerk

## NO. D1-DC-12-904077

## IN THE 147TH DISTRICT COURT
## OF TRAVIS COUNTY, TEXAS

## TROY WILLIAMS,
## APPELLANT

## V.

## STATE OF TEXAS,
## APPELLEE

## APPELLANT'S BRIEF

## ORAL ARGUMENT REQUESTED

**LINDA ICENHAUER-RAMIREZ**
**ATTORNEY AT LAW**
**1103 NUECES**
**AUSTIN, TEXAS    78701**
**TELEPHONE:    512-477-7991**
**FACSIMILE 512-477-3580**
**EMAIL:    LJIR@AOL.COM**
**SBN:    10382944**

**ATTORNEY FOR APPELLANT**

# TABLE OF CONTENTS

**PAGE**

Parties to Trial Court's Final Judgment.......................................................3

Index of Authorities.............................................................................4

Statement of the Nature of the Case .........................................................6

Statement of the Points of Error ...............................................................8

Statement of Facts...............................................................................9

Summary of the Argument ...................................................................25

Point of Error Number One ...................................................................26

Point of Error Number Two...................................................................30

Prayer for Relief ...............................................................................35

Certificate of Service .........................................................................36

Certificate of Compliance....................................................................36

# PARTIES TO TRIAL COURT'S FINAL JUDGMENT

In accordance with Tex.R.App.Proc. 38.1(a), Appellant certifies that the following is a complete list of the parties and their counsel:

(a) the State of Texas represented by:

Ms. Amy Meredith, Assistant District Attorney
Travis County District Attorney's Office
P.O. Box 1748
Austin, Texas 78767

Ms. Marc Chavez, Assistant District Attorney
Travis County District Attorney's Office
P.O. Box 1748
Austin, Texas 78767

(b) Mr. Troy Williams, represented by:

Mr. Alexander Calhoun – trial attorney
Attorney at Law
4301 W. William Cannon Dr. #B 150-260
Austin, Texas 78749-1473

Ms. Linda Icenhauer-Ramirez - appellate attorney
Attorney at Law
1103 Nueces
Austin, Texas 78701

# INDEX OF AUTHORITIES

**CASES**                                                                **PAGE**

Alejandro v. State, 493 S.W.2d 230 (Tex.Cr.App. 1973)..........................32

Almanza v. State, 686 S.W.2d 157 (Tex.Cr.App. 1985) ..........................29

Ballard v. State, 193 S.W.3d 916 (Tex.Cr.App. 2006)..............................27

Bland v. Texas, 2004 Tex.App.LEXIS 4589 (Tex.App.-El Paso
    2004, no pet.) ........................................................................................33

Carreon v. State, 63 S.W.3d 37 (Tex.App.-Texarkana 2001, pet.
    ref.) .......................................................................................................27

Espinosa v. State, 29 S.W.3d 257 (Tex.App.-Houston [14th] 2000,
    pet. ref.) ................................................................................................34

Facundo v. State, 971 S.W.2d 133 (Tex.App.-Houston [14th]
    1998, pet. ref.) .....................................................................................33

King v. State, 953 S.W.2d 266 (Tex.Cr.App. 1997)..................................34

Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90
    L.Ed. 1557 (1946)...............................................................................34

Johnson v. State, 967 S.W.2d 410 (Tex.Cr.App. 1998) ...........................34

Perez v. State, 994 S.W.2d 233 (Tex.App.-Waco 1999, no pet.) ..............32

Posey v. State, 966 S.W.2d 57 (Tex.Cr.App. 1998) ..................................27

Tijerina v. State, 2003 Tex.App.LEXIS 807 (Tex.App.-San
    Antonio 2003, no pet.) ........................................................................33

Webb v. State, 36 S.W.3d 164 (Tex.App.-Houston [14th] 2000, pet.
    ref.).......................................................................................................34

<u>Van Zandt v. State</u>, 932 S.W.2d 88 (Tex.App.-El Paso 1996,
    pet. ref.)..................................................................................32

## STATUTES

V.T.C.A. Penal Code, Sec. 20.04(a)(4) ......................................9

V.T.C.A. Penal Code, Sec. 20.04(d)............................... 8, 26, 27

## COURT RULES

Tex.R.App.Proc. 38.1(a)............................................................3

Tex.R.App.Proc. 44.2(b)..........................................................34

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW Troy Williams, appellant in this cause, by and through his attorney and files this his brief on original appeal.

## STATEMENT OF THE NATURE OF THE CASE

Appellant was charged by indictment in this cause on September 27, 2012. The indictment alleged that appellant committed the offense of aggravated kidnapping. The indictment also contained one enhancement paragraph. (C.R. 5-6) Jury selection occurred on March 13, 2014. (R.R. II, pp. 5-142) On April 1, 2014, appellant entered a plea of not guilty. (R.R. III, p. 12) On April 2, 2014, after hearing the evidence and the argument from counsel, the jury deliberated and returned a verdict of guilty to the offense of aggravated kidnapping.[1] (R.R. IV, pp. 201; C.R. 128-135) On April 4, 2014, after hearing the evidence and argument from counsel, the jury assessed appellant's punishment at sixty (60) years for the offense of aggravated kidnapping.[2] (R.R. VI, pp. 72-73; C.R. 136-147) Appellant was sentenced that day. (R.R. VI, p. 75; C.R. 154-155) The trial court's

---

[1] This case was also consolidated with Cause No. D-1-DC-12-904080 in which appellant was charged with the aggravated sexual assault of the victim. The jury also returned a verdict of guilty with respect to that offense. That case is also pending on appeal in Cause No. 03-14-00229-CR.

[2] The jury assessed appellant's punishment in Cause No. . D-1-DC-12-904080 at eighty-five (85) years and a $10,000.00 fine for the offense of aggravated sexual assault.

certification of defendant's right to appeal was filed on April 4, 2014. (C.R. 153)   A motion for new trial was filed on April 10, 2014.   (C.R. 161-163)   Notice of appeal was also filed on April 10, 2014.   (C.R. 160)

**STATEMENT OF THE POINTS OF ERROR**

**POINT OF ERROR NUMBER ONE**

      **THE TRIAL COURT ERRED IN REFUSING TO GIVE A JURY INSTRUCTION IN THE PUNISHMENT CHARGE ON RELEASE IN A SAFE PLACE IN ACCORDANCE WITH V.T.C.A. PENAL CODE, SEC. 20.04(D).**

**POINT OF ERROR NUMBER TWO**

      **THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO PROSECUTOR AMY MEREDITH'S IMPROPER JURY ARGUMENT ON PAROLE.**

## STATEMENT OF FACTS

The indictment in this case alleged that appellant committed the offense of aggravated kidnapping. The indictment specifically alleged that appellant:

> "on or about the 8th day of March, 2012, did then and there, with the intent to inflict bodily injury on Sherry Dana and with intent to violate or sexually abuse Sherry Dana, intentionally and knowingly abduct Sherry Dana by restricting the movements of Sherry Dana without her consent so as to interfere substantially with her liberty, by confining her with the intent to prevent her liberation, by secreting or holding her in a place where she was not likely to be found, and by moving her from one place to another, by using or threatening to use deadly force, namely, a firearm during the omission of said offense," (C.R. 5-6)

V.T.C.A. Penal Code, Sec. 20.04(a)(4).

The evidence showed that on March 8, 2012, the victim Sherry Dana, as was her usual practice, stopped at the Gus Garcia Recreational Center in North Austin to walk the trails before driving into her work. (R.R. III, pp. 78-79) On this particular morning, as Dana was walking, she could tell that someone was walking behind her. She walked up to a trash can to throw some trash away and then turned around and saw a person coming towards her. She said hello to the man and he said hello to her and walked past her. The man then turned around and began walking right next to

9

her.    The man asked her how she was doing and she told him she was fine. Dana testified that at this point she could see that the man's pants were unzipped and his penis was sticking completely out.    She told the man that he should zip up his pants and they should go their separate ways and he would not get in trouble.    Dana testified that she then stepped past the man and headed back towards the recreation center.    The next thing she knew she felt herself being drug backwards towards the woods that were next to the trail.    Dana testified that she struggled with the man and tried to trip him.    At one point she was able to free herself from the man's grasp and she began running towards the recreation center.    However the man jumped on her back and she fell facedown on the ground.    While she was on the ground, the man tried to pull her pants down.    She fought with him and at one point was able to grab a rubber bracelet off of his wrist and managed to stick the bracelet in her pocket.    The man continued his attack, covering her mouth with his hand and jabbing his fingernails into her cheeks.    The man began thrusting his penis against her vagina.    After a bit the man ejaculated and then he said, "Okay, I'm done and stood up.    Dana testified that she was able to put her clothes back on.    The man told Dana that he had a gun and was going to kill her.    Dana began trying to reason with him, telling him that if he let her go, she would just go to work and not tell

10

anyone what had occurred. In response, the man said that he was from New Orleans and already had two felonies so it would not matter if he killed her. Dana testified that she began walking to the recreation center and he continued to follow her. It was during this time that Dana realized that the man had the keys to her car. When Dana got to the front of the recreation center, she began to reason with the man that if he would put her keys on the ground and walk away, she would not tell anyone what had happened. The man did put the keys on the ground and then turned around to leave. Dana then tried to go inside the recreation center but the door to the building was locked. The man saw her trying to go into the building and said, "You lied." He then picked the car keys up from the ground and headed towards Dana's car. (R.R. III, pp. 86-95) Dana testified that she did not believe the man had a gun, but that he was just trying to act aggressive and dangerous. She testified that the man got into her car and tried to start it but he could not start it. Dana decided she was going to run across Rundberg Lane to Dobie Middle School. But before she began running, the man asked her to help him start the car. Dana decided she would try and get the car keys away from him so that he could not escape. She got in the car, pulled the keys out of the ignition and attempted to run away. The man pursued her and pushed her, causing her to drop the keys.

The man picked the keys up and ran back to the car. At this point Dana ran across Rundberg Lane towards the middle school where an Austin Independent School District vehicle was in the parking lot. Dana ran up to that vehicle and asked a man standing by the truck for help. The man dialed 911 and then Dana talked to the police dispatcher. Police quickly responded. Dana identified appellant in the courtroom as her attacker and she testified that appellant threatened her with death. (R.R. III, pp. 96-106) On cross-examination, Dana testified that she did not think appellant ejaculated inside of her. She testified that she did not believe there was "completed intercourse and ejaculation." She also testified that she told the crime scene tech who responded to the scene as well as the police who responded to the scene and the detective to whom she later gave her statement that appellant had not penetrated her. (R.R. III, pp. 138-153) Dana testified on redirect that she was in fear of her life during the attack and did not expect to get out of it alive. (R.R. III, p. 163)

Stuart Miller, an employee of the Austin Independent School District was at Dobie Middle School to make air conditioner repairs that morning. He testified that Dobie Middle School was right across the street from the Gus Garcia Recreation Center. Miller testified that as he was standing by his truck in the school parking lot, a woman ran across the street and up to

his truck and asked to use his cell phone to call the police. He described the woman as being very shook up and scared. Miller called 911 and then put the lady on the phone. He stayed with her until police arrived. Miller told the jury that as the lady told him the story of what had happened to her, he saw a person running across the field in a southeasterly direction away from the recreation center. (R.R. III, pp. 37-42)

The first officer on the scene was APD Officer Phillip Tripp. When he arrived, he saw Sherry Dana standing in the parking lot with Mr. Miller. Tripp testified that Dana was disheveled and covered in dirt. She had blood on her face and on her left wrist. In addition she had red marks on her face and neck, and redness and swelling near her right eye. (R.R. III, pp. 46-50). Officer Tripp testified that Dana told him that she was walking behind the recreational center when she saw a young black male in his 20s. He was thin and wearing a black knitted hat, a short-sleeved red T-shirt, blue jeans, flannel shorts which showed underneath his jeans and he was carrying a phone or a pager. Dana told Officer Tripp that when she first saw the young man he was walking towards her and had his penis exposed. As he approached her, the man tried to talk to her. Dana told Officer Tripp that she told the man that there were people at the recreation center and that he would get in trouble if they saw him with his penis exposed. She said that

13

the man suddenly grabbed her and drug her through the dirt on her stomach. At one point her pants were pulled down and she was laying face down on the ground. The young man got on top of her and pushed his penis towards her genitals from behind and ejaculated on her legs and genital area. (R.R. III, pp. 59-60) Upon hearing this story Officer Tripp broadcast a description of the subject and called for a crime scene unit. (R.R. III, p. 61)

Other APD officers responded to the area. Officer Christopher Gaines testified that he was about ¼ mile away from the recreation center when he saw someone (appellant) matching the description of the assailant. When he turned on his overhead lights, appellant took off running. Officer Gaines exited his patrol car and chased appellant on foot. After a foot pursuit during which appellant was tased, he was apprehended. Officers found no weapons on appellant. (R.R. III, pp. 195-213)

Appellant was immediately taken to the APD sex crimes office where he was photographed by Crime Scene Specialist Victor Ceballos. Ceballos noted that appellant had an injury to his left wrist and had dirt and mud on his hand. He also had dirt between his fingers. Ceballos noted injuries on appellant's torso under his shirt and there was dirt on his shoes, his legs and his shorts. Ceballos took fingernail scrapings from appellant and swabbed appellant's hands and penis area. Ceballos also collected

appellant's clothing and tennis shoes.     (R.R. III, pp. 217-231)

Phillip Weaver, the custodian at the recreation center was going about his regular duties on March 8, 2012, when a little before 8:00 a.m., he looked out the front doors of the building and saw a man walking away from the front of the building.   He described the individual he saw as a black man, wearing jeans, a red T-shirt and a baseball cap.     The man had a thin build and was from 6' to 6'2" in height.     Weaver testified that a little after that he heard someone pounding on the front door of the recreation center. By the time Weaver got to the front door, he saw a lady walking away from the building and towards a car in the parking lot.     Thinking nothing was amiss, Weaver went back to work.   (R.R. III, pp. 18-26)     Weaver testified that later when police questioned him about the incident he was able to give them copies of the surveillance video from the recreation center. The video showed the individuals that he had described for the jury and showed the woman going to her car and opening the passenger door of her car.     The video then showed the man he had seen approaching the woman. (R.R. III, pp. 27-30)

Austin Police Department Detective Angie Jones responded to the scene on the day of the offense and took an initial statement from Dana. On March 12, 2012, four days later, Dana came to the sex crimes unit and

gave a formal statement to Detective Jones. Dana told Detective Jones that there had been no penetration. (R.R. III, pp. 233-246) As part of her investigation, Detective Jones got a search warrant to obtain DNA samples from appellant and buccal swabs of appellant's DNA were later obtained. (R.R. III, pp. 253-255)

Sherry Dana underwent a SANE[3] exam on the day of the offense. Sexual assault nurse Julie Gibbs testified she that performed the exam on Dana. She noted that Dana had multiple lacerations on her left cheek, broken blood vessels on her back, bruises on the back of her arm, bruising on her buttocks, her hand, red marks on one wrist, bloody abrasions on her other wrist, multiple bruises on her legs and multiple bloody abrasions on her legs and knees. Gibbs testified that she also observed injuries in Dana's vaginal area. Specifically, Dana's urethra was red and irritated and her perineum had two small abrasions. Gibbs testified that she conducted an internal exam and found a few red areas on Dana's cervix, however she could not say how those injuries occurred. In fact she did not know if those red areas could have been normal for Dana. (R.R. IV, pp. 25-61) Gibbs testified that she took various samples from Dana, including a blood sample, vaginal swabs, labial swabs, hair samples (both head and pubic hair), and

---

[3] SANE stands for Sexual Assault Nurse exam.

fingernail scrapings.     (R.R. IV, pp. 62-65)     On cross-examination, Gibbs admitted that she found no abrasions to the area around Dana's urethra, the labia majora, the labia minora, or the posterior forchetta.     She also testified that the abrasions she saw on Dana's perineum were very small -- .2 millimeters (1/8 centimeter or less).     She also testified on cross-examination that she did not see any injury to Dana's cervix and could not say that there was any contact with Dana's cervix.     (R.R. IV, pp. 86-91)

Texas Department of Public Safety DNA analyst Sapana Prajapati testified that she performed the DNA analysis in this case.   She testified that she had DNA samples from appellant, Sherry Dana and Sherry Dana's husband Peter Dana.   When she tested the vaginal swabs obtained from Sherry Dana during the SANE exam, she found a mixture in the sperm fraction from the swab.   Her analysis revealed that appellant could be excluded as a contributor to that mixture, however Dana and her husband could not be excluded as contributors to that mixture.   She testified that she also was able to obtain a DNA profile from the epithelial cell fraction of the vaginal swabs.   Again her testing showed that appellant could be excluded; however Dana's husband could not be excluded.   The bottom line was that appellant was excluded from the DNA found on Dana's vaginal

swabs. (R.R. IV, pp. 99-113) Prajapati also found DNA on the labial swabs taken from Dana. There was a sperm fraction found on the labial swabs and Prajapati testified that this was consistent with appellant's DNA profile and thus appellant could not be excluded as a contributor. She also testified that Dana and her husband could be excluded from this DNA profile. With respect to the epithelial cells from the labial swabs, Prajapati testified that she found a mixture of at least three people. She also testified that neither appellant, Dana or Dana's husband could be excluded as contributors. (R.R. IV, pp. 113-117) On cross-examination Prejapati testified that she could not tell how DNA got to a specific location. She further testified that she could not tell how appellant's epithelial DNA was put on the victim's labia. She admitted it could have been through direct contact or through transference. (R.R. IV, pp. 128, 134)

The State rested after Sapana Prajapati's testimony and then the defense rested without putting on any evidence. Both sides then closed. (R.R. IV, p. 155) After both sides rested and closed, the jury heard argument from both sides, deliberated and then announced its verdicts. The jury found appellant guilty of the offenses of aggravated kidnapping as alleged in Cause No. D-1-DC-12-904077 and guilty of the offense of

aggravated sexual assault as alleged in Cause No. D-1-DC-12-904080. (R.R. IV, p. 201; C.R. 128-135)

Appellant elected to go to the jury for punishment. The indictment contained an enhancement allegation that reads as follows:

> "And the Grand Jury further presents in and to said Court that, prior to the commission of the aforesaid offense, on the 5th day of March, 2007, in cause number 2006-08296J in the 314th District Court of Harris County, Texas, a juvenile court, the Defendant was adjudicated under Section 54.03, Family Code, to have engaged in delinquent conduct constituting the felony offense of Aggravated Sexual Assault of a Child, for which the Defendant was committed to the Texas Youth Commission under Sections 54.04(d)(2) and 54.04(m), Family Code." (C.R. 5-6)

Appellant entered a plea of not true to the enhancement allegation. (R.R. V, p. 10) During the punishment phase of the case, the State called a latent fingerprint examiner who testified that he took appellant's fingerprints and compared them to fingerprints on State's Exhibit 75, a fingerprint card for a person by the name of Troy Luther Williams with a date of birth of ████████████ and found that they matched. The State then introduced State's Exhibits 72 and 73 into evidence which were then tied to State's Exhibit 75 through various identifying information. State's Exhibit 72 showed that appellant had been adjudicated as a juvenile for the offense of aggravated sexual assault of a child under the age of 14 on October 18, 2006 and placed on five years probation. State's Exhibit 72 also showed that the

19

date of the offense was July 5, 2006.    (R.R. V, pp. 24-25; R.R. VII, pp. 138-144)    State's Exhibit 73 showed appellant's probation was revoked on March 5, 2007 and appellant was committed to the Texas Youth Commission on an indeterminate sentence.    (R.R. V, p. 25; R.R. VII, pp. 146-149)

The State put on several additional witnesses.    Sherry Dana described her state of mind as being fearful since the offense.    (R.R. V, pp. 26-27)

R███ G███ took the stand and told the jury about the offense for which appellant had been adjudicated as a juvenile.    G███ testified that she lived in Kingwood, a suburb of Houston and was the mother of two children, C███ age 19 and S███, age 13.    She testified that the family knew appellant as a child because he was a friend of C███.    When S███ was six years old she was sexually assaulted by appellant.    G███ testified that the incident affected the whole family, especially S███. (R.R. V, pp. 31-37)

Dr. John Hertenberger, the clinical director at the Rockdale Regional Juvenile Justice Center, testified that the Rockdale center is a privately run post-adjudication facility for adolescents with sexual behavior problems. He testified that appellant was admitted to the center on November 8, 2006.

Dr. Hertenberger described for the jury how a juvenile could progress through the three different phases of the center's program – behavior compliance, education, and therapy and testified that it was possible for a juvenile to complete the program in four and a half months. Dr. Hertenberger testified that appellant was unsuccessfully discharged from the program on February 14, 2007 after only three months (R.R. V, pp. 38-42)

Alysia Fain, a case manager from the McLennan County State Juvenile Correctional Facility, a part of the Texas Juvenile Justice Department, was the next witness. She testified that there are three tracks that the juveniles work on while they are at the facility – academic, behavioral and correctional. Fain testified that appellant was sent to the unit in May of 2007 and was very inconsistent in his progress. In December of 2007, he was placed in the sex offender program but he was unsuccessfully discharged from the program in May of 2008. In September of 2008, he was placed back in the program but was unsuccessfully discharged again in June of 2010. In July of 2010, he was put back in the program. Initially he was up and down in his progress but in his last four months, he began to do better by controlling his impulsive behaviors and his anger and internalizing what he was learning. He

finally completed the sex offender program in January of 2011. Fain testified that normally the program is a nine to twelve month program but it took appellant two years and eight months to complete it. After his discharge, from the program, appellant was sent to a half-way house in August of 2011. Fain testified that appellant was at her facility from ages 14 to 18. (R.R. V, pp. 58-78)

Richard Williamson, a licensed sex offender treatment provider, testified that he worked at the MacLennan Unit of the Texas Juvenile Justice Department in 2010 and 2011. During that time he worked as appellant's sex offender program therapist. Williamson testified that initially appellant denied part of his offense and he was very slow to engage in the program. He gradually made progress and was eventually successfully discharged from the program. He testified that in the end appellant showed empathy for his victim and seemed to grasp the strategies to keep from reoffending. (R.R. V, pp. 79-85)

Desiree Welsch, another program therapist at the MacLennan Unit testified that she also worked with appellant while he was at the unit. She described appellant as very manipulative and dramatic. (R.R. V, pp. 90-94)

Kervin Babers testified that in 2011 he was employed at Turman

House, a halfway house in Austin for juveniles who were coming out of the Texas Juvenile Justice Department. He testified that appellant came to the halfway house in 2011 when he was 18 to learn life skills. Babers testified that appellant escaped from the locked facility on August 31, 2011. Police found him and brought him back. Appellant stayed at the halfway house for a few months and was discharged shortly before his 19th birthday. (R.R. VI, pp.. 6-13)

Kevin Wooden testified that he worked as a juvenile corrections officer at the Turman House for ten years. He recounted another incident on September 20, 2011, when appellant and another boy escaped from the facility. (R.R. VI, pp. 20-22)

The State's last witness, Sgt. M. Hardin testified about an incident that occurred at the Travis County Correctional Center (Del Valle) while appellant was incarcerated for these offenses. Sgt. Hardin testified that on March 19, 2014, she was inside a building watching appellant who was outside in the recreation yard through a window. She related that appellant was facing the window she was behind and he was masturbating. (R.R. VI, pp. 27-28)

The State rested after Sgt. Hardin's testimony. The defense rested without putting on any evidence and both sides then closed. (R.R. VI, p.

44)

After hearing the argument of counsel from both sides, the jury found the enhancement allegation to be true and assessed appellant's punishment at sixty (60) years for the offense of aggravated kidnapping and eighty-five years and a $10,000.00 fine for the offense of aggravated sexual assault. (R.R. VI, pp. 72-73; C.R. 136-147)

## SUMMARY OF THE ARGUMENT

In his first point of error, appellant argues that the trial court erred in refusing appellant's request to give the jury an instruction in the punishment jury charge about the appellant releasing the complainant in a safe place. Appellant asserts that the evidence showed that when he left the complainant at the door of the recreation center and attempted to leave in the complainant's car, she was released in a safe place. The jury should have been given the opportunity to make a finding on this issue. If the jury had found that appellant had released the complainant in a safe place, his punishment would have been capped at twenty years. Instead, the jury was given a punishment range of that of a first degree felony and then assessed appellant's punishment for aggravated kidnapping at sixty years. Appellant was harmed.

In his second point of error, appellant argues that the trial court erred when it overruled his objection to the prosecutor's improper jury argument regarding parole. The prosecutor instructed the jury on how to violate the parole law charge by calculating when appellant would be eligible for parole. This is a clear violation of the law and the trial court erred in overruling appellant's objection.

## POINT OF ERROR NUMBER ONE

**THE TRIAL COURT ERRED IN REFUSING TO GIVE A JURY INSTRUCTION IN THE PUNISHMENT CHARGE ON RELEASE IN A SAFE PLACE IN ACCORDANCE WITH V.T.C.A. PENAL CODE, SEC. 20.04(D).**

Aggravated kidnapping is normally a first degree felony. However, if the evidence shows that the defendant released the victim in a safe place, the level of the offense is reduced to a second degree felony. V.T.C.A. Penal Code, Sec. 20.04(d) provides the following:

> "(d) At the punishment stage of a trial, the defendant may raise the issue as to whether he voluntarily released the victim in a safe place. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree."

During the charge conference at the conclusion of the punishment phase of the trial, the court explained its reasoning for not instructing the jury on "release in a safe place":

> "THE COURT: Back on the record, case at trial State versus Troy Luther Williams. Prior to the break, we had gone over the proposed charge that the Court had given to both parties. The State did not want the safe place language in the aggravated kidnapping charge. The Court has now reviewed the entire testimony of the witness; and so, therefore, based on that I do not believe that that particular portion of the charge would be appropriate in light of the testimony, so I removed that from the charge. It is the Court's finding that this was one ongoing episode and even after the assault took place and she went to the rec center and then went to the car, at no point was she quote, unquote, released. In fact, she was even negotiating

and struggling even at a point for her keys, at the car she was pushed. So I find that it was one episode; and so, therefore, I don't think it's appropriate to put that language in there. And I will allow you to make whatever record you would like with respect to that, Mr. Calhoun.

MR. CALHOUN: Yes, sir. If you would please note our objection to the omission. We believe the evidence would give the jury -- it is a fact issue before the jury and by omitting that from the Court's charge it prevents us from raising an affirmative defense in our closing argument. Just please note our exception." (R.R. VI, pp. 45-46)

After having been found guilty of aggravated kidnapping, during punishment, a defendant may raise the issue of whether he voluntarily released the victim in a safe place. V.T.C.A. Penal Code, Sec. 20.04(d). However, to be entitled to a jury instruction on the issue of voluntary release, the record must contain evidence that raises the issue and the defense must request a voluntary release instruction or object to the absence of such an instruction in the charge on punishment. See Posey v. State, 966 S.W.2d 57, 63 (Tex.Cr.App. 1998). In assessing whether the evidence raises the issue, the focus must be on the evidence relating to the defendant's conduct. See Carreon v. State, 63 S.W.3d 37, 39 (Tex.App.-Texarkana 2001, pet. ref.). A defendant is entitled to an instruction on voluntary release in a safe place only when he performed "some overt and affirmative act that informs the victim that he has been fully released from captivity. . . ." Ballard v. State, 193 S.W.3d 916, 919 (Tex.Cr.App. 2006).

27

A review of the evidence shows that appellant did several "overt and affirmative act[s]" that informed the victim that she had been fully released. Sherry Dana testified that after appellant finished assaulting her, she began walking back towards the rec center and appellant walked beside her. She testified that when they reached the building the following occurred:

> "When I got to the front of the building, I just -- he kept on walking with my keys. And I said, just leave the keys and nothing is going to happen. And so he turned back and he set the -- oh, he came back towards me and it scared me that he was coming back towards me, so I said, just put them on the ground, put them on the ground. And he put them on the ground and he turned around to leave again. And I just thought that I could just push on that door and be inside and the door was locked. (R.R. III, p. 95)

Clearly when appellant put Dana's keys on the ground and turned around to leave, that was an affirmative act on appellant's part which conveyed to Dana that he was releasing her from captivity. Although appellant ended up coming back to get the keys because he saw Dana knocking on the front doors of the recreation center, appellant did not resume restraining Dana, rather he took the keys and got into Dana's car in an attempt to escape the scene and leave her there. (R.R. III, pp. 95-96) At that point Dana was released and was not restrained in any way by appellant and was free to walk across the street and contact the AISD employee who was in the school parking lot. The evidence clearly shows that this was a safe place.

The events that occurred after that point were not because appellant renewed his attack on Dana or because he was attempting to restrain her in any way. Rather, the evidence shows that Dana decided to try and stop appellant from leaving and so she re-engaged with appellant when he asked her to help him start her car, thinking that if she got the car keys she could prevent him from leaving the scene in her car. (R.R. III, pp. 96-97).

The evidence clearly showed that when appellant walked away from Dana and attempted to leave the rec center parking lot in her car, this was an affirmative act on his part that told Dana that the assault and kidnapping was over. The trial court clearly erred in refusing appellant's request to instruct the jury on the release in a safe place.

Appellant suffered "some harm" as a result of the trial court's error. Almanza v. State, 686 S.W.2d 157 (Tex.Cr.App. 1985). Had the jury found that Dana was released in a safe place, appellant's maximum punishment would have been capped at twenty years imprisonment. Instead the jury was given a punishment range with a maximum of life or ninety-nine years in prison and ended up assessing appellant's punishment at sixty years in prison. Appellant did suffer "some harm." This point of error must be sustained.

## POINT OF ERROR NUMBER TWO
**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO PROSECUTOR AMY MEREDITH'S IMPROPER JURY ARGUMENT ON PAROLE.**

During her closing argument at punishment, prosecutor Amy Meredith made an improper jury argument applying the parole law to appellant:

> "What this charge is telling you is, when you go back there you can't say, I wonder when he'll be paroled. What you do know and what the law provides is that he has to serve at least half of the term before he is eligible for parole. And, ladies and gentlemen, you cannot consider the eligibility, if he is actually going to get paroled. Okay? That is not something that you need to be talking about. What we do know and as an example, let's say you gave a 50-year sentence, he would be eligible for parole –
>
> MR. CALHOUN: Judge, may I -- I have an objection. May I approach, please?
>
> THE COURT: Yes.
>
> **(At Bench, on the record)**
> MR. CALHOUN: Judge, I object to the State's argument. The jury was told not to consider parole and she's actually telling them how to consider it and how to calculate the sentence by which they will consider it. I believe that the whole argument we have heard here while arguing Paragraph 6 is, in fact, directing them to consider this subliminally.
>
> THE COURT: I'm not understanding your objection.
>
> MR. CALHOUN: The State is telling the jury don't consider parole, but he has to serve half the time, so if you want

him to serve a 50-year sentence or, you know. She's directing the jury how to do the calculations, Judge. She's directing them to Paragraph 6 and basically saying consider it and I think it's objectionable. It's one thing to have it in there, but another thing to argue and then advise a jury how you can consider the time you want him to serve.

THE COURT: I'm not following. I guess what I'm saying is that basically to your objection that -- the instruction says they can't consider parole.

MR. CALHOUN: That's correct, Judge. And the State is relying upon that. The State has proceeded beyond that and they are now advising the jury how to do the parole calculations. I believe she is telling them to do the parole calculations in your head by specifically referring to numbers and calculating and dividing it.

THE COURT: That's overruled. I'll make a statement.

MR. CALHOUN: Note our objection to any more, Judge.

THE COURT: Okay. Thank you.

**(Open court, defendant and jury present)**
THE COURT: Ladies and gentlemen, you will be guided by the charge that has been given to you by the Court. Like I said to you, what the lawyers are arguing is not evidence. It is what they believe the evidence is. Not only that, the law or what the law is, the law is the charge that is given to you and you will be guided by the charge. All right. Thank you." (R.R. VI, pp. 51-53)

The prosecutor then immediately resumed her improper argument:

"MS. MEREDITH: Thank you, Your Honor. So what the law provides and what the charge says is that the defendant will not become eligible until he serves at last half of whatever sentence is assessed. So, for example, if it was a 50-year sentence, he would not be eligible until 25 years. If it's a

60-year sentence, he is not eligible until 30 years. If it's 60 to life, there's still that same 30 years. Okay? So he -- if you assess a life sentence, then he is still eligible at 30 years." (R.R. VI, pp. 53)

Proper jury argument falls into four specific categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument by opposing counsel, and (4) plea for law enforcement. Alejandro v. State, 493 S.W.2d 230, 231 (Tex.Cr.App. 1973); Van Zandt v. State, 932 S.W.2d 88, 92 (Tex.App.-El Paso 1996, pet. ref.). The law provides that it is acceptable to quote or paraphrase the court's charge during argument. Perez v. State, 994 S.W.2d 233, 237 (Tex.App.-Waco 1999, no pet.). This includes explaining or paraphrasing the parole law instruction in the charge. However, it is improper for a prosecutor to apply the parole law to the defendant during jury argument. In Perez v. State, the Waco Court of Appeals noted that there exists a thin, tenuous line between "paraphrasing" and "applying" the parole law to a particular defendant. Perez v. State, supra at 237.

Here, the prosecutor specifically applied the parole law and her calculations to appellant when discussing parole law eligibility ("let's say you gave a 50-year sentence, he would be eligible for parole –."). This was clearly improper jury argument and the trial court erred when it overruled appellant's objection and allowed the prosecutor to continue her improper

32

argument.

An argument similar to the prosecutor's in appellant's case was condemned by the El Paso Court of Appeals in Bland v. Texas, 2004 Tex.App.LEXIS 4589 (Tex.App.-El Paso 2004, no pet.). In Bland, the prosecutor argued the following:

> "For that reason, I feel that you should give him a period of at least 20-years, that means he's going to have to serve half that before he can become eligible for parole-" 2004 Tex.App.LEXIS 4589, *24.

See also Facundo v. State, 971 S.W.2d 133, 136 (Tex.App.-Houston [14th] 1998, pet. ref.)(where the Court of Appeals found that the defense lawyer's argument applying the parole law charge to his client was improper and thus the trial court properly sustained the State's objection to his argument. See also Tijerina v. State, 2003 Tex.App.LEXIS 807 (Tex.App.-San Antonio 2003, no pet.)(holding that prosecutor's argument applying parole law to defendant was improper). Clearly the trial court erred in overruling appellant's objection to the prosecutor's improper argument.

Because there was error, the appellate court must determine the harmfulness of the error to appellant. Appellant urges the Court of Appeals to find that this error was harmful. Because the error involved the trial court's application of Texas statutory law, the appellate court must

utilize Tex.R.App.Proc. 44.2(b) in making that determination. See Espinosa v. State, 29 S.W.3d 257, 259 (Tex.App.-Houston [14th] 2000, pet. ref.). Under this rule, error that does not affect a substantial right must be disregarded. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex.Cr.App. 1997), citing Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). If the error had no influence or only a slight influence on the verdict, it is harmless. Johnson v. State, 967 S.W.2d 410, 417 (Tex.Cr.App. 1998). However, if the appellate court is unsure whether the error affected the outcome, the court should treat the error as harmful, i.e., as having a substantial and injurious effect or influence in determining the jury's verdict. Webb v. State, 36 S.W.3d 164, 182 (Tex.App.-Houston [14th] 2000, pet. ref.).

Here the prosecutor's argument was a clear violation of the law. She directly applied the parole law to appellant and she urged the jury to violate the jury instructions they had just been given and to consider the parole law when they were assessing appellant's sentence. The trial court overruled appellant's objection so there was no attempt to cure the error by the trial court. The result was that after appellant's objection was

overruled, the prosecutor again repeated her improper argument telling the jury how to apply the parole law to appellant and the jury was left with the idea that it was permissible to consider the parole law and appellant's eligibility for parole when determining the length of appellant's prison sentences. Appellant received a hefty sentence in this case – sixty years .[4] Clearly appellant was harmed by the prosecutor's improper parole law argument. This point of error should be sustained.

## PRAYER

Appellant respectfully requests that this Honorable Court sustain his points of error and reverse the trial court and remand the case for a new trial.

Respectfully submitted,

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ
Attorney at Law
1103 Nueces
Austin, Texas 78701
(512) 477-7991
FAX: (512) 477-3580
SBN: 10382944
Email: ljir@aol.com

ATTORNEY FOR APPELLANT

---

[4] As noted above, this case was tried along with the aggravated sexual assault case in Cause No. D-1-DC-12-904080. The jury assessed appellant's punishment in that case at eighty-five (85) years and a $10,000 fine. (C.R. 136-147) The trial court ordered that both sentences run concurrently. (C.R. 154-155)

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was computer generated and contains 7,256 words, as calculated by the word count function on my computer.

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Appellant's Brief on Original Appeal served by e-service to the Travis County District Attorney's Office on this the 25th day of May, 2015.

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ